**Marilyn J. WILSON,**
**Plaintiff–Appellant,**

v.

**William M. SLIGAR, M.D.,**
**Defendant–Appellee.**

**No. 72A01–8704–CV–84.**

Court of Appeals of Indiana,
First District.

Dec. 23, 1987.
Rehearing Denied Feb. 3, 1988.

Mary Jane Humphrey, Evansville, for plaintiff-appellant.

Richard L. Mattox, Samuel A. Day, Wyatt, Tarrant, Combs & Orbison, New Albany, for defendant-appellee.

RATLIFF, Chief Judge.

## STATEMENT OF THE CASE

Marilyn J. Wilson appeals from the Scott County Circuit Court a jury verdict and judgment entered in favor of William M. Sligar, M.D. We affirm.

## FACTS

In June of 1977, Marilyn J. Wilson began to suffer from pain in her hip, which was previously operated on after an automobile accident in 1964. Wilson sought medical help and eventually was referred to William M. Sligar, M.D. Initially, Dr. Sligar attempted non-surgical treatment to reduce the pain suffered by Wilson. After these treatments failed, Dr. Sligar recommended and eventually performed total hip replacement surgery. After the operation Wilson suffered from a burning sensation in her left foot and developed a condition called "foot drop". Dr. Sligar treated Wilson for the "foot drop" condition and recommended additional surgery.

Wilson refused to have Dr. Sligar perform additional surgery, and instead sought medical opinions and treatment from William Naldo Capello, an orthopedic surgeon. Dr. Capello determined that Wilson had sciatic nerve palsy, and referred Wilson to Robert Worth, a neurosurgeon. Drs. Capello and Worth jointly operated on Wilson. During surgery the doctors observed a kink in Wilson's sciatic nerve, which apparently had been caused by a retractor used during the surgery performed by Dr. Sligar. According to the testimony at trial, sciatic nerve palsy results from total hip replacement in up to five percent (5%) of the cases. (i.e. 50 per 1000), depending on the area in the country where the operation is performed.[1] The surgery performed by Drs. Capello and Worth partially corrected Wilson's sciatic nerve palsy.

Wilson filed a complaint against Dr. Sligar in accordance with Indiana's Medical Malpractice Act and obtained a finding from a medical review panel on September 13, 1984. The panel determined that the evidence did not establish malpractice. Thereafter, on January 16, 1985, Wilson filed a complaint against Dr. Sligar alleging malpractice. On October 27, 28, and 29, 1986, a trial was held. During the trial, Wilson attempted to elicit testimony from Dr. Sligar and Dr. Capello on the standard of care for board certified orthopedic surgeons doing total hip replacement surgery. Record at 162–65, 170, 202. After objection and argument, the trial court prohibited the proffered testimony as being incompetent and without adequate foundation, because the questions sought testimony which did not connect the standard of care to the "same or similar community" as that in which Dr. Sligar performed the surgery. Wilson challenges the trial court's rulings.

## ISSUE

Wilson raises one (1) issue on appeal:

Whether the trial court erred by excluding testimony as to a standard of care which was not defined in terms of the "same or similar locality".

## DISCUSSION AND DECISION

Wilson argues that the trial court erred by excluding expert testimony on the standard of care for board certified orthopedic surgeons. In challenging the trial court's evidentiary rulings, Wilson confronts a strong standard of review. The trial court is empowered with broad discretion in de-

---

1. An exceptionally low palsy rate of .7% has been recorded at the Mayo Clinic.

termining the competency of an expert witness and the admissibility of his testimony. *Weinstock v. Ott* (1983), Ind.App., 444 N.E.2d 1227, 1233, *trans. denied.* On appeal, this court will not disturb the trial court's rulings absent an abuse of discretion. *Id.*

The rulings Wilson challenges all involve the application of the "same or similar locality" rule to the standard of care for medical specialists. In Indiana, an expert witness may not testify as to the standard of care unless the record shows that the witness is familiar with the standard of care in the same or similar locality as the one in which the complained of services were performed. *Iterman v. Baker* (1938), 214 Ind. 308, 320–21, 15 N.E.2d 365, 371; *Yang v. Stafford* (1987), Ind.App., 515 N.E.2d 1157, 1161; *Weinstock*, at 1235. This rule stems from the standard of care that a specialist owes to a patient. The standard of care is defined as follows:

> "The degree of skill and care required of the physician or surgeon who is employed because he is a specialist, is that degree of skill and knowledge which is ordinarily possessed by physicians and surgeons who devote special attention to the ailment, its diagnosis and treatment, agreeable with the state of scientific knowledge at the time of the operation or treatment, in similar localities generally."

*Worster v. Caylor* (1952), 231 Ind. 625, 630, 110 N.E.2d 337, 339, *overruled on other grounds; Gramm v. Boener* (1877), 56 Ind. 497, 501; *Hobbs v. Tierney* (1986), Ind. App., 495 N.E.2d 217, 219, *trans. denied; Dolezal v. Goode* (1982), Ind.App., 433 N.E. 2d 828, 831, *trans. denied; Bassett v. Glock* (1977), 174 Ind.App. 439, 445, 368 N.E.2d 18, 22. Thus, the specialist's standard of care is measured with reference to the same or a similar locality as that in which the services were performed. *Joy v. Chau* (1978), 177 Ind.App. 29, 36, 377 N.E. 2d 670, 675, fn. 1, *trans. denied.*

The "same or similar locality" rule developed in part as a compromise to the decreasing justification and logic behind the strict "locality" rule. The strict "locality" rule originated during a time when substantial discrepancies existed between rural and urban communities with regard to medical opportunities, equipment, facilities, and knowledge of new procedures and when the ability to travel between rural and urban communities was more restricted. The rule was intended to prevent the inequity that would result from holding rural doctors to the same standard of care as urban doctors. However, the discrepancies between rural and urban areas with regard to opportunities, equipment, facilities, and available knowledge have lessened over time. Furthermore, the advances in communication networks, travel means and modern educational opportunities have all but eliminated the justifications for a strict "locality" rule. In response to the decreased justifications, many courts have abrogated the "locality" rule. However, Indiana and other jurisdictions have adhered to a modified, less stringent version of the locality rule. Indiana currently measures a physician's conduct and defines the physician's standard of care in relation to the "same or similar localities".[2] The main purpose of the same or similar locality rule, however, still is aimed at insuring that, "the physician's professional conduct [will] be judged in light of the conditions and facilities with which he must work". *Purtill v. Hess* (1986), 111 Ill.2d 229, 247, 95 Ill.Dec. 305, 312, 489 N.E.2d 867, 874.

**2.** We note that today even the less stringent "same or similar locality" rule is under attack with regard to nationally board certified specialists. *Joy v. Chau* (1978), 177 Ind.App. 29, 36, 377 N.E.2d 670, 675, n. 1, *trans. denied; see also, Morrison v. MacNamara* (1979), D.C.App., 407 A.2d 555; *Orcutt v. Miller* (1979), 95 Nev. 408, 595 P.2d 1191; *see generally,* Karlson and Erwin, *Medical Malpractice: Informed Consent to the Locality Rule,* 12 Ind.L.Rev. 653. A national standard of care appears to be justified for spe-

cialists who are nationally certified, who have equal access to new theories and modern facilities, and who are equally able to refine their procedures. However, regardless of the merit of changing the standard for specialists to a national standard of care, as an intermediate appellate tribunal this court is not at liberty to depart from the standard of care embodied in our supreme court's precedent. Therefore, this court will apply the "same or similar locality" rule to the specialist in the present case.

The "same or similar locality" rule's definition and application is flexible and not governed by precise criteria. *Weinstock*, at 1235; *Hansborough v. Kosyak* (1986), 141 Ill.App.3d 538, 545, 95 Ill.Dec. 708, 713, 490 N.E.2d 181, 186. The scope of the rule's application will necessarily vary with the facts and circumstances of every case. *Weinstock*, at 1235; *Hansbrough*, 141 Ill. App.3d at 545, 95 Ill.Dec. at 713, 490 N.E. 2d at 186. However, in determining the scope and application for the "same or similar locality rule", the Illinois Appellate Court stated in *Hansbrough*, that,

"The term 'locality' itself has no precise meaning, and varies with the facts of each particular case. (*Stogsvill v. Manor Convalescent Home, Inc.* (1976), 35 Ill.App.3d 634, 343 N.E.2d 589.) The applicable locality should be narrowed no further than necessary to promote the rationale of the rule. (*Chamness v. Odum* (1979), 80 Ill.App.3d 98, 35 Ill.Dec. 404, 399 N.E.2d 238.) However, where it is determined that only one uniform standard of care for treatment exists, the national standard and the community standard may be synonymous. (*Hunter v. Sukkar* (1982), 111 Ill.App.3d 169, 66 Ill.Dec. 848, 443 N.E.2d 774.) Further, as the supreme court recently recognized, a doctor will not necessarily be disqualified as an expert even if he is unfamiliar with the practices of a particular community as long as there are certain minimum standards of care uniform throughout the country for the particular practice. *Purtill v. Hess* (1986), 111 Ill.2d 229, 245–47, 95 Ill.Dec. 305, 312–13, 389 N.E.2d 867, 874–75."

*Hansbrough*, 141 Ill.App.3d at 545, 95 Ill. Dec. at 713, 490 N.E.2d at 186. This court agrees that the foregoing principles should be applied in determining the scope and application of the rule and in determining whether the trial court abused its discretion in making an evidentiary ruling based on the "same or similar locality" rule.

■ In the present case, Wilson failed to establish that the trial court committed reversible error in making the evidentiary rulings based upon the application of the locality rule to the proffered testimony.

Wilson's challenges to the trial court's rulings involve questions to Dr. Sligar and Dr. Capello. Record at 162–65, 170, 202. These questions asked whether board certified orthopedic surgeons doing total hip replacements have the same standard of care regardless of where they are performed. These questions were objected to based upon lack of foundation and upon the ground that they did not sufficiently define or relate the standard of care to the locality in which Dr. Sligar operated or to other similar localities. The trial court sustained the objections on foundational and competency grounds, and excluded the proffered testimony.

■ The trial court improperly excluded the proffered testimony which sought to establish the scope and applicability of the "same or similar locality" rule in the present case. Although Dr. Sligar correctly argues that testimony delineating the standard of care cannot be admitted without an adequate foundation, only one of Wilson's questions directly asked for the specific standard of care. The other questions were directed toward establishing a foundation for the competency of the witness to testify as to the applicable standard of care. The witnesses' testimony involving the standard of care could not be presented until the evidence demonstrated either (1) that the witnesses were familiar with the standard of care in the same or similar locality as the one in which Dr. Sligar performed surgery or (2) that the witnesses were testifying with regard to certain minimum standards of care that are uniform throughout the country for the particular practice. *Purtill*, 111 Ill.2d at 245–46, 95 Ill.Dec. at 312–13, 489 N.E.2d at 874–75. However, to present evidence under the second foundation, the proponent must show that the available conditions and facilities were irrelevant to a determination of the standard of care. *Purtill*, 111 Ill.2d at 246, 95 Ill.Dec. at 313, 489 N.E.2d at 875. In the present case, Wilson was attempting to establish this foundational evidence and not the actual testimony on the standard of care. Therefore, the trial court's ruling was erroneous.

■ Although the trial court erred in excluding this foundational testimony, Wilson failed to establish that reversal is warranted. Any error in the trial court's evidentiary rulings and exclusions of testimony was rendered harmless when Wilson presented to the jury the same evidence on the standard of care in other evidence and testimony that was not excluded. First, the record reflects that Wilson's attorney was permitted to read the deposition of Dr. Norman V. Lewis to the jury. The record reflects the following:

"BY BOYD HOVDE: Page # 9, question # 38.

Q38 Would it be your opinion that the standard of care for board certified orthopedic surgeons doing total hip replacements is the same no matter where they do them?

"BY RICHARD MATTOX: Objection, your honor, for the grounds previously stated in the question previously propounded to Dr. Sligar.·

"BY BOYD HOVDE: The response is, your honor, that the standard of care is established by medical people testifying to the standard of care and the only way there is a standard of care established is by the testimony of medical witnesses.

"BY RICHARD MATTOX: The standard of care, your honor, is a question of law.

"BY BOYD HOVDE: That is not the fact, your honor.

"BY THE COURT: I will overrule the objection, you may ask.

"BY BOYD HOVDE:

A Yes."

Record at 177–78. Second, the in court testimony of Dr. Capello related also that the standard of care for board certified orthopedic surgeons was the same regardless of the locality. Dr. Capello testified, as follows:

"BY BOYD HOVDE:

Q179 Dr. Capello, are you familiar with the standard of care excerised [sic] by board certified orthopedic surgeons doing total hip replacements in December of 1979 generally?

A Yes sir.

Q180 Is that standard of care, uh, any different or was it any different in New Albany or Clark County, Indiana than it was in Indianapolis or Louisville or indeed for any other city in the United States?

"BY RICHARD MATTOX: Objection, your honor, there is no foundation no factual foundation that this man is familiar with the standard of care as it did exist in Clark County, Indiana on that date.

"BY BOYD HOVDE: That goes to the weight and not the admissibility or the right to answer the question, your honor, that is a matter of cross examination.

"BY THE COURT: I will overrule the objection.

A You better say it again, I lost it.

Q181 The question was whether the standard of care in December of 1979 was any different in Jeffersonville than any other community?

A No I don't believe it was.

Q182 Are you familiar with the standard of care exercised by board certified orthopedic surgeons· doing total hip replacements in areas and communities similar to Jeffersonville, Indiana?

A Yes. ·

Q183 Doctor, based upon Dr. Sligar's description of his operation here in open court earlier this afternoon and based upon your familiarity with his · operative note that you have read and based upon what you saw and found when you participated in the operation on Marilyn Wilson in November of 1980 do you have an opinion as to whether Dr. Sligar in his performing that surgery comported and complied with the standard of care customarily exercised by board certified orthopedic surgeons doing that operation?

A I have an opinion.

Q184 What is your opinion?

A My opinion is that I think there was excessive retraction on the nerve which would be out of keeping with the standards as I understand them."

Record at 202–04. Therefore, the jury obtained the previously excluded evidence on the standard of care, and any error was rendered harmless. Since Wilson failed to establish reversible error, the decision of the trial court is affirmed.