SUMMIT BANK, As Personal Representative of the Estate of Angela L. Roop, Deceased Appellant (Plaintiff Below),

v.

Constantine PANOS, M.D., and Caylor–Nickel Clinic, Appellees (Defendants Below).

No. 90A04–9005–CV–227.

Court of Appeals of Indiana, Fourth District.

May 1, 1991.

ty. The discussion of getting a judgment against him was relevant to the issue of damages.

Edward L. Murphy, Jr., Robert T. Keen, Jr., Miller Carson & Boxberger, Fort Wayne, for appellant.

James V. Donadio, Bonnie L. Gallivan, Ice Miller Donadio & Ryan, Indianapolis, for appellees.

MILLER, Judge.

Constantine Panos, M.D., associated with the Caylor–Nickel Clinic, prescribed Darvon on December 23, 1983, for Angela Roop, mother of two minor children. Roop died on December 24, 1983, from the combination of an overdose of Darvon, alcohol, and other drugs. Summit Bank, plaintiff-appellant, the personal representative of the Estate of Angela Roop, filed a medical malpractice action against defendants-appellees Dr. Panos and the Clinic[1] (collectively Dr. Panos), alleging that Roop's death was caused by Dr. Panos' negligence in prescribing Darvon without giving her warnings of the danger of taking the medication with alcohol. After a medical re-view panel issued a decision in favor of Dr. Panos, Summit filed suit in Wells Circuit Court. The trial court awarded summary judgment in favor of Dr. Panos.

Summit claims the trial court erred in awarding summary judgment because the affidavit of its proposed expert witness, Dr. Linda S. Lane, was sufficient to establish a question of fact as to whether Dr. Panos was negligent in failing to warn or instruct Roop about the dangers associated with the overuse of or the mixing of Darvon with alcohol or other medications when he prescribed the medication for her on December 23, 1983. Summit also argues that Dr. Panos' own deposition presents undisputed evidence that he failed to give Roop instructions and she died of an overdose of such medications and alcohol the following day. Thus, Summit claims the evidence presented to the trial court raises at least an inference that Dr. Panos' negligence contributed to Angela Roop's death.

We restate the issues which are presented by this appeal as follows:[2]

1) Whether Dr. Lane's original affidavit was sufficient for consideration as expert opinion on the standard of care when a) she was not a practicing physician or a family practice specialist in 1983 and b) she stated she was familiar with the standard of care in Bluffton, Indiana but had never practiced in Indiana or in a small community similar to Bluffton;

2) Whether Dr. Panos' published deposition testimony was sufficient to establish the standard of care for a physician in Bluffton, Indiana in 1983 and to establish a question of fact as to whether he failed to meet that standard; and

3) Whether there is any evidence that Dr. Panos' actions proximately caused Roop's death.

We reverse, finding summary judgment was inappropriate because the materials

---

1. Summit alleges in its appellant's brief that Caylor–Nickel Clinic was joined in the action solely on the basis of the doctrine of *respondeat superior*. There is no issue presented for review with respect to Caylor–Nickel; therefore, we will limit our discussion to Dr. Panos.

2. Summit also claims the trial court erred in denying its motion to supplement Dr. Lane's deposition. Because we find Dr. Lane's original affidavit and Dr. Panos' deposition testimony were sufficient to take this case to the jury, we need not determine whether the court erred in denying Summit's motion to supplement the affidavit.

before the court—Dr. Lane's original affidavit and Dr. Panos' deposition—established a genuine issue of material fact as to whether Dr. Panos was negligent in failing to warn Roop of the risks of overusing or combining Darvon with alcohol or other drugs.

## FACTS

The uncontested facts revealed by the materials furnished the trial court are as follows:

Dr. Constantine Panos received his medical degree from the University of Chicago in 1956. He joined the Caylor–Nickel Clinic in 1972 as a staff physician. He received his Certification from the American Board of Family Practice in August of 1978 and was recertified in 1984.

Dr. Panos first treated Angela Roop in 1973. Thereafter he saw her intermittently at the Clinic. Dr. Panos was aware that Roop had emotional problems and recalled one occasion in February, 1978, when Roop was taken to the Emergency Room of the Caylor–Nickel Hospital for an overdose of sleeping pills. She left the hospital to obtain additional drugs and later (on February 19, 1978), was returned to the hospital with slashed wrists. Dr. Panos was on emergency room duty and treated her lacerations. Dr. Panos was also aware that Roop suffered from "significant emotional problems"—"depressive reactions" which required medical treatment. (R. 93).

Dr. Panos treated Roop on December 23, 1983, when she visited him complaining of an upper respiratory infection. He prescribed Erythromycin, Dimetapp and 30 tablets of 65 mg. Darvon (Plain). At the time Dr. Panos prescribed these medications, he was aware that Roop was taking Elavil (Amitriptyline), an anti-depressant on a regular basis. Dr. Panos was also familiar with the warnings and instructions provided by the manufacturer of Darvon. In spite of his knowledge of the dangers of overuse and mixture of Darvon with alcohol or other medications, and despite his knowledge of Roop's history of depression and addiction, he admits that he did not warn or instruct Roop not to exceed the recommended dosage of Darvon or not to mix Darvon with alcohol or other drugs. Roop died the next day on December 24, 1983. Dr. Panos acknowledged that Darvon was the largest contributor to Roop's death.

## DISCUSSION AND DECISION

On September 28, 1989, Dr. Panos filed a Motion for Summary Judgment, alleging that summary judgment was appropriate because there was no genuine issue of material fact and Panos was entitled to judgment as a matter of law because Summit had failed to show by expert testimony 1) the standard of care required, 2) any breach of duty, and 3) proximate cause. The motion included the favorable decision of the Medical Review Panel, pursuant to Ind.Code 16–9.5–9–9. Summit Bank filed a Motion in Opposition and included the Affidavit of Linda S. Lane, M.D., which disclosed that she was licensed to practice medicine in the states of Illinois, Massachusetts and California and, like Dr. Panos, she was Board Certified in family practice. Dr. Lane further asserted in her affidavit that she was employed as a general practitioner and was familiar with the standard of care of general practitioners in Bluffton, Indiana or similar localities.

At the hearing on the motion on November 17, 1989, counsel for Dr. Panos argued that the affidavit of Dr. Lane was insufficient to defeat the motion because it did not disclose a sufficient factual basis to support her allegation that she was familiar with the standard of care of family practitioners in Bluffton, Indiana or similar localities at the *time of the incident in question*. On November 29, 1989, approximately two weeks after the hearing on the motion, Summit filed a motion to supplement the affidavit of Dr. Lane. In the supplemental affidavit, Dr. Lane asserted that a national minimum standard of care is applicable to all Board Certified Family Practitioners and that she is familiar with that national standard, which has not changed from 1983 to the present. On January 22, 1990, after reviewing the motion to supplement Dr. Lane's affidavit, the

court denied the motion and granted summary judgment to Dr. Panos.

Summit contends the court erred in denying its motion to supplement Dr. Lane's affidavit and that Dr. Lane's original affidavit, although containing a conclusion that she was familiar with the standard of care in Bluffton or similar communities, was sufficient to raise a material issue of fact precluding summary judgment. Dr. Panos argues there was no error, because neither the original nor the supplemental affidavit was sufficient to show Dr. Lane's competency to testify. He also argues that even if there might be some evidence of breach of duty, Summit cannot demonstrate proximate cause because an individual's suicide is an intervening act and new agency precluding liability.

*Standard of Review*

When reviewing a grant or denial of summary judgment, this court must apply the same standard applicable in the trial court. *Ayres v. Indian Heights Volunteer Fire Dept.* (1986), Ind., 493 N.E.2d 1229. The court must consider the contents of the pleadings, affidavits, discovery responses and depositions in a light most favorable to the non-moving party to determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. *Progressive Construction & Engineering Co., Inc., v. Indiana & Michigan Electric Co.* (1989), Ind.App., 533 N.E.2d 1279. "When a motion for summary judgment is sustained, the non-moving party is prevented from having his day in court, and, therefore, the determination of the trial court on the motion must be carefully scrutinized on appeal." *Ayres, supra,* at 1234.

As this court observed in *Stumph v. Foster* (1988), Ind.App., 524 N.E.2d 812:

"Rarely is a negligence case appropriately disposed of by summary judgment, especially when the critical question for resolution is whether the defendant exercised the degree of care under the factual circumstances. This issue is generally a question for the trier of fact, and not answerable as a matter of law. The purpose of summary judgment procedure

is to terminate litigation of a cause about which there can be no factual dispute and which can be determined as a matter of law. Therefore, the burden is on the proponent of a summary judgment to demonstrate the absence of any genuine issue as to a material fact. All doubts and fair inferences are to be resolved in favor of the opponent. The sole question is whether a legitimate and material factual controversy was shown to exist within the substantive and procedural posture of the case."

*Id.* at 814 (citations omitted).

*I. Sufficiency of Dr. Lane's Affidavit*

■ To prevail in an action for medical malpractice, a plaintiff must establish that: 1) a duty was owed to the patient by the doctor; 2) the doctor breached his duty by allowing his conduct to fall below the applicable standard of care; and 3) the plaintiff suffered a compensable injury proximately caused by the doctor's breach of duty. *Wielgus v. Lopez* (1988), Ind.App., 525 N.E.2d 1272.

■ As a general rule, expert medical testimony is required to establish whether the physician's conduct in the treatment and care of his patient falls within the duty required by the applicable standard of care, unless the issue is so obvious that the jury could evaluate the doctor's conduct without extensive technical input. *Burke v. Capello* (1988), Ind., 520 N.E.2d 439, (doctor failed to remove excess cement from wound in hip replacement); *Payne v. Marion General Hospital* (1990), Ind.App., 549 N.E.2d 1043, (doctor, over the telephone and without seeing the patient for several hours, issued a no-code order not to attempt to revive a patient); *Stumph v. Foster* (1988), Ind.App., 524 N.E.2d 812, (chiropractor broke patient's rib during manipulation of spine in treatment for migraine headaches); *Searcy v. Manganhas* (1981), Ind.App., 415 N.E.2d 142; *Revord v. Russell* (1980), Ind.App., 401 N.E.2d 763.

A. *Did the expert physician need to be a practicing physician or in family practice in 1983?*

First, Dr. Panos argues that Dr. Lane's original affidavit failed to meet the founda-

tional requirements to establish her competency to render an expert opinion because her resume, attached to and made a part of the affidavit, states that in December, 1983, the date the incident occurred, she 1) was a resident in Ophthalmology in Boston, Massachusetts, 2) did not have any association with or familiarity with family practice until she began a residency in family practice in 1984, and 3) was not board certified in the specialty of family practice until 1987. Thus, Dr. Panos argues Dr. Lane could not have been familiar with the standard of care for a physician or family practice specialist practicing in 1983.

 In Indiana, the standard of care required of a physician is that degree of care, skill and proficiency which is commonly exercised by ordinarily careful, skillful and prudent specialists in a similar locality and at the time of the operation or treatment. *Burke, supra; Worster v. Caylor* (1953), 231 Ind. 625, 110 N.E.2d 337 (overruled on other grounds in *New York, Chicago and St. Louis Railroad Co. v. Henderson* (1957), 237 Ind. 456, 146 N.E.2d 531). An expert witness may not testify to the standard of care unless the record shows that the witness is familiar with the standard of care in the same or similar locality as the one in which the complained of services were performed. *Wilson v. Sligar* (1987), Ind.App., 516 N.E.2d 1099. In order to be admissible an expert opinion must be preceded by a foundation of evidence establishing the witness's credentials. *Yang v. Stafford* (1987), Ind.App., 515 N.E.2d 1157. However, there is no requirement that the physician who testifies as an expert witness must have been practicing at the time of the incident in question. An expert witness acquires the knowledge which is the basis of his expertise in two basic ways: formal training or practical experience. *Warner v. State* (1983), Ind., 455 N.E.2d 355. Thus, the knowledge may be acquired through hands-on experience, formal education, specialized training, study of textbooks, performing experiments, and observation. 13 W. MILLER, INDIANA PRACTICE § 702.103, at 35–37 (1984), citing *Warner, supra; Isenh-*

*our v. State* (1901), 157 Ind. 517, 62 N.E. 40.

 While supporting and opposing affidavits for summary judgment motions pursuant to Ind.Trial Rule 56(E) *shall* be made on personal knowledge, that does not mean that a physician, who qualifies as an expert witness, must obtain his knowledge only from first-hand practical experience. Our courts have never held that a scientific witness can only testify from facts learned by personal experience. *Ortho Pharmaceutical Corp. v. Chapman* (1979), 180 Ind.App. 33, 388 N.E.2d 541. A witness who testifies as an expert need not base her opinion testimony on personal knowledge if the opinion is based on evidence of a type normally found reliable and customarily relied upon by others in the witness's profession or area of expertise. *Kranda v. Houser–Norborg Medical Corp.* (1981), Ind.App., 419 N.E.2d 1024; *reh'g denied* 424 N.E.2d 1064, appeal dismissed (1982), 459 U.S. 802, 103 S.Ct. 23, 74 L.Ed.2d 39. Thus, it was not necessary that Dr. Lane have been in practice in 1983 in order for her opinion to be admissible.

B. *Was Dr. Lane's affidavit sufficient to show she was familiar with medical standards in Bluffton or similar communities?*

 Dr. Panos further argues that Dr. Lane's affidavit was also defective because she could not have been aware of the standard of care in communities similar to Bluffton, Indiana, because her resume revealed her experience was limited to Massachusetts, Boston and Illinois, citing *Ellis v. Smith* (1988), Ind.App., 528 N.E.2d 826. In *Ellis,* this court found the affidavit of the proposed expert physician, who did not practice medicine in this state, insufficient; however, a close reading of the *Ellis* decision reveals that the plaintiffs offered the doctor's affidavit which stated that, although she practiced medicine in Pennsylvania, she had studied medicine in Indiana and "was aware of the *standard of care in the state.*" *Id.* at 829, (emphasis added). This court, observing that the doctor mentioned she was familiar with the standard

of care in the "state" and not the standard of care in the same or similar locality, held:

"An expert medical witness may not testify to the standard of care unless the record shows that the witness is familiar with standard of care in the same or similar locality as the one in which the complained of services were performed, *or* that the witness is testifying as to certain minimal standards of care that are uniform throughout the country for that particular practice."

*Id.* at 829, (emphasis added), citing *Wilson, supra.*

On the other hand, it has been held that an affidavit which asserts in conclusory terms that a doctor is familiar with the applicable standard of care is sufficient to resist summary judgment. *Yang,*[3] *supra.* More recently, in *Kopec v. Memorial Hospital of South Bend* (1990), Ind.App., 557 N.E.2d 1367, we held that a doctor's affidavit which stated in conclusory terms that he was familiar with the standard of care in communities similar to South Bend was sufficient to resist summary judgment.

In the present case, Dr. Lane's first affidavit read as follows:

"1) Affiant is a physician who is licensed to practice medicine in the states of Illinois, Massachusetts and California and is board certified by the National Board of Medical Examiners and the American Academy of Family Practitioners, and has personal knowledge of the facts set forth herein. (See Dr. Lane's resume, attached hereto and made part hereof, marked as Exhibit "A").

"2) *Affiant is currently employed as a general practitioner and is familiar with the standard of care exercised by general practitioners in Bluffton, Indiana or similar localities.*

"3) Affiant has reviewed the medical records of Angela Roop, along with the deposition of Dr. Constantine Panos, the report of the Coroner's Inquest and the report of the Department of Toxicology of Indiana University.[4]

"4) It is affiant's opinion that Dr. Panos failed to meet the standard of care exercised by general practitioners in Bluffton, Indiana or similar localities in treating Angela Roop and that failure contributed to cause Angela Roop's death.

"5) Dr. Panos prescribed Darvon (plain) 65 for Roop's chest wall pain. Darvon is a narcotic which can cause respiratory depression. Approximately one (1) week earlier, Ms. Roop had been given a prescription for Elavil, an anti-depressant.

"6) Dr. Panos failed to give Ms. Roop specific instructions in the risks and benefits that could occur from the use of the Darvon. More particularly, he failed to warn Ms. Roop of the risks involved in taking this medication with any other medication or taking this medication with Ethanol.

"7) While Darvon may have been an appropriate medication to treat Ms. Roop's chest wall pain, Dr. Panos should have carefully instructed her as to the possible risks of taking the medication

---

**3.** The Yangs sued Dr. Stafford, an obstetrician, and a hospital for medical malpractice during a caesarean delivery, which later necessitated a life-saving hysterectomy. The medical review panel found in favor of the doctor and the trial court granted summary judgment in his favor. On appeal, the Yangs claimed that the trial court erred in striking the affidavit of their expert witness, Dr. Work. Dr. Work's affidavit stated that he was licensed to practice obstetrics and gynecology in Illinois and stated that he was "familiar with the standard of care of physicians who specialize in obstetrics such as Dr. Stafford in cities of the size of Fort Wayne with a metropolitan population in excess of 500,000 or in similar communities." 515 N.E.2d at 1161–1162. He further alleged in his affidavit

that he was "also familiar with standard hospital care for general hospitals in communities such as Fort Wayne." *Id.* The defendants argued that Dr. Work was incompetent to testify because of his inaccurate statement regarding the *population* of Fort Wayne. This court concluded that Dr. Work was competent to testify despite the inaccuracy in the population size, because of his statement that he was familiar with the standard of care for general hospitals in communities such as Fort Wayne.

**4.** The Coroner's Report and report of the Department of Toxicology of Indiana University were not included in the record.

and this instruction should have been properly documented on her chart.

"8) Ms. Roop was found to have Ethanol, Nortriptyline, Propoxyphene and Norpropoxyphene in her blood at the time of her death. Ms. Roop died as a result of the ingestion of the combination of these substances."

(R. 40–41, emphasis added).

Here, Dr. Lane's affidavit asserts that she is familiar with the standard of care for physicians as "exercised by general practitioners in Bluffton" or similar communities. Her assertion that she was familiar with the standard of care is sufficient under *Yang* and *Kopec* to resist summary judgment. Furthermore, Dr. Lane's affidavit revealed that she had read Dr. Panos' published deposition in which he acknowledged the standard of care for a practicing physician in Bluffton in 1983. Dr. Lane could have relied on Dr. Panos' testimony as the basis for her opinion. *Warner, supra; Kranda, supra.* Therefore, the original affidavit of Dr. Lane should not have been disqualified on the basis that she was unfamiliar with the standard of care in Bluffton or a similar locality.

*II. Dr. Panos' Deposition*

■ In addition to Dr. Lane's affidavit, the trial court had before it the published deposition testimony of Dr. Panos and the opinion of the Medical Review Panel[5]. Even if we were to find Dr. Lane's affidavit insufficient, Dr. Panos' deposition testimony was sufficient to establish the standard of care for a physician in Bluffton in 1983 and to establish a question of fact as to whether he failed to meet that standard. Dr. Panos acknowledged that the largest contributor to Roop's death was the ingestion of approximately twenty-three Darvon (Plain) tablets along with alcohol and Amitriptyline (Elavil prescribed by another physician). He acknowledged that he was familiar with the 1983 Physicians Desk Reference (PDR) which advised physicians to warn their patients not to exceed the

recommended dosages for Darvon and to limit the intake of alcohol. The PDR also advised doctors against prescribing the drug for patients who are suicidal or addiction prone. Dr. Panos stated that he was aware of Roop's past suicide attempt and drug misuse. He also testified that he did not recall giving Roop any warning on December 23, 1983. Additionally, his deposition contains the following testimony:

"Q: Had you ever given her 'any instructions', Doctor, with respect to limiting her alcohol or limiting her dosage, with respect to the Darvon?

A: I do not know for certain. I feel that it is likely that I had. I feel that this young lady was sophisticated enough, in her knowledge of drugs, that certainly, somewhere along the line, that either Dr. Van, Dr. Caylor or Dr. Rumana, someone.... surely, and perhaps several of us, had indicated to her that, you know, this was something that we worried about ... because of her past history."

. . . .

Q: And Doctor, it would not be in compliance with customary medical care to rely upon another physician to inform a patient as to a drug that you were prescribing, would it?

A: Of course not.

. . . .

Q: And if it wasn't done would you agree that that would not be in conformity with the warnings that are contained on Exhibit 1 [1983 PDR entry for Darvon]?

A: I would agree that it would not be in conformity, yes, sir."

(R. 136–137).

Dr. Panos' testimony shows that he acknowledged a duty to warn Roop of the dangers in overdosing or mixing Darvon with other drugs and alcohol. He also acknowledged that to rely on other doctors to inform his patient about the risks of misusing the drugs would not be in con-

---

5. The opinion of the Panel did not address the issue of proximate cause, but concluded that "[t]he evidence does not support the conclusion that either of the Defendants, Constantine Pa-

nos, M.D., or Caylor–Nickel Clinic, failed to meet the applicable standard of care as charged in the complaint." (R. 32)

formity with the customary standard of care. The evidence is conflicting on whether he breached the duty. Nevertheless, such evidence is sufficient to withstand a motion for summary judgment. *See Critelli v. Long Island Jewish–Hillside Medical Center* (1985), 115 A.D.2d 632, 496 N.Y. S.2d 290, (doctor's pre-trial deposition in which he failed to negate inference of negligence as a matter of law raised triable issue of fact precluding summary judgment, notwithstanding fact that patient did not submit affidavit of medical expert).[6]

### III. Proximate Cause

■ Dr. Panos argues that even if there is some evidence that he breached a duty owed to his patient, there is insufficient evidence to support proximate cause and, thus, he claims summary judgment in his favor was proper. Dr. Panos acknowledges that the cause of Roop's death was from an overdose of a mixture of alcohol, Darvon and other drugs. However, he argues that a voluntary, willful act of *suicide* committed by an individual who knows the purpose and physical effects of the act constitutes a new and independent agency, citing *Riesbeck Drug Co. v. Wray* (1942), 111 Ind.App. 467, 39 N.E.2d 776.

In *Riesbeck*, a wrongful death action was initiated against a pharmacy which sold carbolic acid to the decedent's son. The decedent, who sent his eight-year old son to the pharmacy to purchase the carbolic acid, drank the carbolic acid to commit suicide. Unlike the present case, there was no evidence that the pharmacist knew about the mental condition of the decedent or for what purpose the carbolic acid would be used—a significant factor in this court's decision:

"The voluntary, willful act of suicide of an insane person, who knows the purpose and physical effect of his act, is such a new and independent agency as will not come within and complete a line of causation from a defendant's alleged negligent act in making sale of a substance or instrumentality with which human life may be taken, *when there is nothing in the conditions or circumstances to indicate to the seller that the substance or instrumentality will be used for such purpose.*"

*Id.,* 39 N.E.2d at 781, (emphasis added).

We observe that the act of suicide presumes that the individual is aware and has sufficient knowledge that his act will lead to his own death. Summit does not concede that Roop committed suicide. Dr. Panos stated in his deposition that he was aware of Roop's history of mental depression and misuse of drugs, but he could not recall *ever* warning her of the dangers of misusing the Darvon—overdosing or combining Darvon with alcohol and other drugs. There is nothing in the record to indicate whether Roop had sufficient knowledge of the effects of her act.

Summit argues that whether giving a warning to Roop would have prevented her death is a question of fact and should be submitted to the jury. Summit cites *Jarrell v. Monsanto Company* (1988), Ind. App., 528 N.E.2d 1158, for the proposition that the law presumes a warning would be heeded. *Jarrell* is a products liability action in which the plaintiff claimed that Monsanto failed to adequately warn of the dangers of misuse of its product, sulphur. An employee of a rubber manufacturing plant poured two fifty-pound bags of Monsanto sulfur into storage bins which were ten feet below the position where he was working, causing an explosion. Monsanto claimed that an explosion was bound to

---

6. *See also Abbey v. Jackson* (1984), D.C.App., 483 A.2d 330, (plaintiff in medical malpractice case can establish prima facie case for lack of informed consent through testimony of defendant physician without calling independent experts); *Mulder v. Parke Davis & Co.* (1970), 288 Minn. 332, 181 N.W.2d 882, (prima facie case of negligence existed even without expert testimony where it was shown doctor prescribed drug despite written warning from manufacturer that the drug could have fatal side effects and that it should not be used when less dangerous remedies were available. The court stated that when a physician chooses to deviate from a manufacturer's instruction for use of a drug, the burden should be on the physician to explain why he deviated from the recommended treatment, particularly where drastic results such as death might occur.)

occur when the sulphur was poured from such a height. This court observed that although warnings cannot make a dangerous product safe, the presence of warnings might render a hidden and specific danger open and obvious. *Id.* at 1166.

The situation in *Jarrell* is analogous to the present case in that a question of fact exists as to whether Roop's actions of alleged misuse would have occurred if adequate warnings had been given.[7] The foreseeability of the ultimate injury as a natural and probable consequence of an act or omission determines the existence of proximate cause. *Yaney v. McCray Memorial Hospital* (1986), Ind.App., 496 N.E.2d 135. The question of proximate cause is a question of fact unless only a single conclusion can be drawn. *Id.*

In *Keebler v. Winfield Carraway Hospital* (1988), Ala., 531 So.2d 841, a wrongful death medical malpractice claim, it was alleged that a physician and hospital were negligent for failing to prevent the suicide of a patient. The *Keebler* court held that a physician's duty to guard against suicide of a patient is conditional on the *foreseeability* of the suicide. In that case, the court noted there was no expert testimony that the particular factual circumstances should have led the physician and hospital to view a suicide as a reasonable foreseeability and no testimony that they should have guarded against it. In the present case, Summit does not directly complain that Dr. Panos failed to prevent Roop's alleged suicide, but the negligence charged is a failure to warn his patient of the risks of mixing Darvon with other drugs or alcohol. Given Roop's history, and Dr. Panos' own testimony of his awareness of her emotional problems, there is a genuine issue of fact whether it was foreseeable that Roop might abuse the drugs which he prescribed for her. Whether Roop committed suicide or accidentally overdosed is a question of fact. Likewise, whether giving a warning to Roop would have prevented her accidental death or her suicide is a question for the jury.

Here, the court was presented with an inference of Dr. Panos' negligence despite the medical review panel's opinion to the contrary. As our supreme court observed in *Burke, supra,* justice requires a trial in such instances. The evidence is sufficient to withstand summary judgment, while it remains to be seen whether it will result in a jury verdict for Roop's estate.

Therefore, we reverse and remand for further proceedings.

CONOVER and BAKER, JJ., concur.

---

7. *See also Hamilton v. Hardy, M.D., and G.D. Searle & Co.* (1978), 37 Colo.App. 375, 549 P.2d 1099, (plaintiff's right to recover from physician on theory that he failed to inform her of risk of abnormal blood clotting associated with birth control pills was resolved on basis of what a reasonable person would have decided if adequately informed; her failure to testify that she would not have taken the pill if she had been advised of the risk did not defeat her claim).