Carla **HOTTINGER** and **Gregory Hottinger, Appellants–Plaintiffs,**

v.

**TRUGREEN CORPORATION** and **PBI/Gordon Corporation, Appellees–Defendants.**

No. 18A02–9509–CV–545.

Court of Appeals of Indiana.

May 8, 1996.

Frederick R. Hovde, Townsend Hovde & Montross, Indianapolis, for Appellants.

Jeffrey C. McDermott, Linda J. Cooley, Krieg, Devault, Alexander & Capehart, Indianapolis, Michael K. Yarbrough, Frost & Jacobs, Columbus, Ohio, Beth Schneider Naylor, Frost & Jacobs, Cincinnati, Ohio, for Appellees.

## OPINION

ROBERTSON, Judge.

Plaintiffs–Appellants, Carla and Gregory Hottinger [Hottinger] appeal the adverse summary judgment entered against them in their negligence and product liability action against Defendants–Appellees Trugreen Corporation and PBI/Gordon Corporation [Trugreen] for injuries that Carla had allegedly suffered from exposure to a broadleaf herbicide known as Trimec 2–4–D. In the establishment of her prima facie case, Hottinger relied on the expert opinion of Dr. Heuser to the effect that Trimec 2–4–D had been the proximate cause of Carla's permanent and continuing injuries. The trial court ruled that Heuser's opinion would be excluded for its failure to satisfy the requirements of Ind.Evidence Rule 702 and entered summary judgment accordingly.

Hottinger raises two issues, but we address only one of them because it requires reversal. Restated, it is whether Dr. Heuser's opinion is admissible under Evid.R. 702.

Trugreen asserts that it is entitled to summary judgment on the alternative basis that Hottinger's common law claims for the failure to warn are preempted by the Federal Insecticide, Fungicide and Rodenticide Act [FIFRA]. We agree and therefore affirm partial summary judgment with respect to Hottinger's claims based on the failure to warn.

## FACTS

The facts in the light most favorable to nonmovant Hottinger reveal that on April 18, 1990, Trugreen Corporation, a lawn care company, sprayed Trimec 2–4–D herbicide outside of Carla Hottinger's office and permitted the herbicide to pass through the open windows. Hottinger and several of her co-workers were exposed to the herbicide and became ill, complaining of nausea and lightheadedness. After being exposed to the herbicide, Hottinger developed continuing symptoms of headaches, nausea, dizziness, muscle aches, blackouts, and respiratory difficulty.

Gunnar Heuser, M.D., Ph.D., examined Hottinger and conducted a battery of diagnostic tests upon her. Dr. Heuser concluded that Hottinger had brain, peripheral nerve, and immune function deficits which had been caused by her exposure to Trimec 2–4–D on April 18, 1990. Additional facts are supplied as necessary.

## DECISION

Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C); *Great Lakes Chemical Corp. v. International Surplus Lines Insurance Co.*, 638 N.E.2d 847, 849 (Ind.Ct.App.1994). In reviewing a motion for summary judgment, this court must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court. *Cloverleaf Apartments, Inc. v. Town of Eaton*, 641 N.E.2d 665, 667 (Ind.Ct.App.1994). A trial court's grant of summary judgment is "clothed with a presumption of validity," and the appellant bears the burden of demonstrating that the trial court erred. *Rosi v. Business Furniture Corp.*, 615 N.E.2d 431, 434 (Ind.1993). Nevertheless, the appellate court must carefully scrutinize the trial court's decision to ensure that the losing party is not improperly denied her day in court. *Oelling v. Rao*, 593 N.E.2d 189, 190 (Ind.1992).

### I.

*Evidence Rule 702*

The defendant is entitled to summary judgment where the plaintiff cannot

establish that her injuries were proximately caused by the defendant's conduct. *Webb v. Jarvis,* 575 N.E.2d 992, 995, 997–998 (Ind. 1991); *Porter v. Whitehall Laboratories, Inc.,* 9 F.3d 607, 612 (7th Cir.(Ind.) 1993). Where expert testimony is advanced to establish the element of proximate cause, summary judgment is properly entered in favor of the defendant where that expert testimony fails to meet the Evid.R. 702 requirements for admissibility. *Porter,* 9 F.3d at 614–617 (Federal Rules of Evidence).

■■ Indiana Evidence Rule 702 reads as follows:

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

The Indiana Supreme Court has held that the federal evidence law of *Daubert v. Merrell Dow Pharmaceutical, Inc.,* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, and its progeny are helpful in applying Indiana's Evid.R. 702. *Steward v. State,* 652 N.E.2d 490, 498 (Ind.1995) (Evidence of child sexual abuse syndrome would not be admissible to prove that child abuse had occurred). Evidence Rule 702 assigns to the trial court a "gatekeeping function" of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. *Daubert,* 509 U.S. at 596, 597, 113 S.Ct. at 2798, 2799. When faced with a proffer of expert scientific testimony, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Porter,* 9 F.3d at 613. The trial court's determination regarding the admissibility of expert testimony under Evid.R. 702 is a matter within its broad discretion which will not be disturbed unless the trial court's application

of the *Daubert* framework is manifestly erroneous. *Bradley v. Brown,* 42 F.3d 434, 437 (7th Cir.(Ind.) 1994).

■ There are important differences between the quest for truth in the courtroom and the quest for truth in the laboratory. *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798. Pseudoscientific conjectures that are probably wrong are of little use in the project of reaching a quick, final, and binding legal judgment. *Id.* Scientific knowledge admissible under Evid.R. 702 connotes more than subjective belief or unsupported speculation. *Porter,* 9 F.3d at 614. As such, under Evid.R. 702, expert testimony must be supported by appropriate validation or "good grounds" based on what is known establishing a standard of evidentiary reliability. *Steward,* 652 N.E.2d at 498. Expert testimony requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility. *Id.* Although the testimony need not be known to a certainty, any inference or assertion must be derived by the scientific method. *Porter,* 9 F.3d at 613.

■ Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be empirically tested. *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796. Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. *Id.* at 593, 113 S.Ct. at 2797. While publication is not a *sine qua non* of admissibility, submission to the scrutiny of the scientific community is a component of 'good science.' *Id.* Finally, widespread acceptance can be an important factor in ruling whether particular evidence is admissible under Evid.R. 702 and a technique which has attracted only minimal support may properly be viewed with skepticism. *Id.* The *Daubert* court noted:

The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and

methodology, not on the conclusions that they generate.

*Id.*

The *Daubert* court noted further that in keeping with the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony, Evid.R. 702 was more liberal with respect to the admission of evidence than the traditional "general acceptance" standard established by *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (1923). *Daubert,* 509 U.S. at 588, 113 S.Ct. at 2794. In responding to the contention that the abandonment of the *Frye* "general acceptance" standard would result in a "free-for-all" approach in which befuddled juries would be confounded by absurd and irrational pseudoscientific assertions, the *Daubert* court noted:

> In this regard respondent seems to us to be overly pessimistic about the capabilities of the jury, and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. Additionally, in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment.... These conventional devices, rather than wholesale exclusion under an uncompromising 'general acceptance' test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702.

*Id.* at 596, 113 S.Ct. at 2798 (Citations omitted).

■ In the present case, Dr. Heuser established that he was a medical doctor, as well as a Ph.D., specializing in internal medicine with an emphasis on movement disorders, recurrent headaches, chronic pain, endocrine problems, and toxic exposure. Dr. Heuser conducted a literature search to determine whether any illnesses or injuries had been found to be associated with the (2–4–D) herbicide. He found articles, which have been included in the record, from the Journal of the American Medical Association and the Archives of Environmental Health dating as far back as 1959 that have documented findings of peripheral neuropathy and nervous system injury after exposure to the (2–4–D) herbicide. Dr. Heuser also submitted a paper of his own which had been accepted for publication in Vol. 10, No. 4 of *Toxicology and Industrial Health* that outlined a methodology for using a brain scan to confirm the effects upon the brain of the exposure to toxic chemicals.

Dr. Heuser explored Hottinger's medical history and determined that, before her exposure to (2–4–D), she had had some mild chemical sensitivity that had not interfered with her ability to work full-time or to live a normal life. However, after her exposure to (2–4–D) in 1990, she had brain, peripheral nerve and immune function deficits consistent with toxic exposure to the herbicide. Before 1990, Hottinger had had a serum test used to diagnose auto-immune disorders, the results of which had been normal. However, the same test performed after her exposure to the herbicide had not come back normal.

Hottinger's brain scan showed diminished blood flow and scalloping in the temporal, frontal, and parietal lobes of her brain consistent with other brain scan findings in patients exposed to neurotoxic chemicals. Neuropsychological testing revealed that Hottinger had organic brain deficits compatible with toxic exposure. Dr. Heuser ordered several diagnostic tests including a brain scan, an MRI of the brain, sinuses and nasopharynx, an EEG, and an assessment of her peripheral sensory nerve function which ruled out causes other than toxic exposure as the cause of Hottinger's symptoms.

Dr. Heuser concluded that Hottinger had suffered a chemical injury as the result of her exposure to Trimec 2–4–D on April 18, 1990. His opinion was based upon the temporal proximity of the onset of Hottinger's symptoms to her exposure to the herbicide, her medical history (before and after), his examination, the diagnostic evaluations performed, and his own education and experience. Dr. Heuser's opinion that Hottinger's injuries were caused by her exposure to the herbicide (2–4–D) are supported by the scientific publications subjected to peer review as well as the temporal congruity of the

onset of Hottinger's symptoms with the exposure to Trimec 2–4–D.[1]

The scientific principles upon which Dr. Heuser's opinion is based are sufficiently reliable that it will assist the trier of fact in its determination of whether Hottinger's injuries and continuing disabilities were caused by her exposure to Trimec 2–4–D. Therefore, the trial court abused its discretion in determining that Dr. Heuser's opinion failed to satisfy the standards of Evid.R. 702 for admissibility. To the extent that Hottinger's evidence on the causation of her injuries is shaky, the conventional devices available to Trugreen including vigorous cross-examination, the presentation of contrary evidence, and careful instruction on the burden of proof, are the appropriate safeguards to be employed here, as Dr. Heuser's opinion satisfies the standards of Evid.Rule 702. *See Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798. Accordingly, we hold that Hottinger established a prima facie case, including the element of probable causation, and that the trial court's entry of summary judgment in favor of Trugreen was erroneous.

## II.

### *Failure to Warn*

■ Trugreen asserts that Hottinger's common law claims based upon the failure to warn have been preempted by the Federal Insecticide, Fungicide, and Rodenticide Act [FIFRA], 7 U.S.C. § 136v(b). We agree.

The broad prohibition imposed by FIFRA against state regulation of warning labels on hazardous substances bars common-law liability attempts to impose liability on top of that provided by federal laws. *MacDonald v. Monsanto Company,* 27 F.3d 1021 (5th Cir.1994) (Case involving the same herbicide, 2–4–D, as in the present case); *King v. E.I. Dupont De Nemours & Co.,* 996 F.2d 1346 (1st Cir.1993), *cert. dismissed,* 510 U.S. 985, 114 S.Ct. 490, 126 L.Ed.2d 440; *Shaw v. Dow Brands, Inc.,* 994 F.2d 364, (7th Cir.(Ill.), 1993); *Papas v. Upjohn Co.,* 985 F.2d 516 (11th Cir.1993), *cert. denied,* 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248; *Arkansas–Platte & Gulf Partnership v. Van Waters & Rogers, Inc.,* 981 F.2d 1177 (10th Cir.1993), *cert. denied,* 510 U.S. 813, 114 S.Ct. 60, 126 L.Ed.2d 30. Accordingly, FIFRA preempts state common law strict liability and negligence claims for defective warnings or the failure to warn of the hazards associated with the products subject to regulation under the Act. *Id.*[2]

Trimec 2–4–D is subject to FIFRA. Therefore, we affirm the entry of partial

---

1. Trugreen's reliance on *Bradley,* 42 F.3d 434, is misplaced. The *Bradley* plaintiffs alleged that their exposure to pesticides caused them to suffer injuries including a condition known as Multiple Chemical Sensitivity Disorder (MCS). *Id.* at 435. The *Bradley* court upheld the trial court's determination that the plaintiffs' expert testimony regarding the cause of MCS did not satisfy Evid.R. 702 because the expert opinions were merely hypothetical, anecdotal, and 'entirely too subjective and speculative [to constitute] ... the tested hypotheses foreseen as the basis of "scientific knowledge" ... under Rule 702.' *Id.* at 438. The *Bradley* court noted further that an examination of the peer review literature raised further doubts as to the plaintiffs' experts' explanations of the causes of MCS. *Id.* The District Court in *Bradley* extensively reviewed the scientific literature submitted on MCS which revealed the scientific consensus that MCS was in the early stages of scientific scrutiny and the causes of MCS were, as of yet, unknown. *Bradley v. Brown,* 852 F.Supp. 690, 698–700 (N.D.Ind.1994), *affirmed* 42 F.3d 434 (as cited above).

   Nevertheless, notwithstanding the inadmissibility of the expert testimony linking the *Bradley*

plaintiffs' MCS disorder with their exposure to the pesticide, the *Bradley* plaintiffs survived summary judgment and in fact were awarded a small amount of damages. 42 F.3d at 435. The *Bradley* case stands for the proposition that temporal congruity between the exposure to toxic chemicals and the onset of symptoms may constitute some evidence of causation. 852 F.Supp. at 697. In the present case, Hottinger does not allege that she suffers from MCS. Thus, the *Bradley* decision carries little weight in the present analysis.

2. The Indiana supreme court recently performed an excellent preemption analysis in determining that a common law product liability claim against an automobile manufacturer was not preempted by the National Traffic and Motor Vehicle Safety Act of 1966. *Wilson v. Pleasant,* 660 N.E.2d 327 (Ind.1995). The *Wilson* case is distinguishable from the case at bar because the Safety Act contains a savings clause which provides: "Compliance with any federal motor vehicle safety standard issued under this subchapter does not exempt any person from liability under common law." *Id.* at 335 (citing 15 U.S.C. § 1397(k) (1988)).

summary judgment with respect to Hottinger's common law claims for negligence and product liability for the failure to warn of the dangers of exposure to Trimec 2–4–D.

### CONCLUSION

We affirm partial summary judgment with respect to Hottinger's claims based on the failure to warn. We reverse the trial court's determination that Hottinger failed to present competent evidence on the element of proximate causation. Accordingly, we reverse the entry of summary judgment with respect to Hottinger's remaining claims of negligence and product liability—defective and unreasonably dangerous product, and remand these claims for trial.

BAKER and KIRSCH, JJ., concur.