**Steven LYTLE, Individually and as Guardian of the Person and Estate of Kyong Lytle and as Parent and Natural Guardian of Michelle Lytle, Appellant–Plaintiff,**

v.

**FORD MOTOR COMPANY, Appellee–Defendant.**

No. 54A04–0402–CV–104.

Court of Appeals of Indiana.

Sept. 7, 2004.

Rehearing Denied Dec. 2, 2004.

Roger L. Pardieck, Pardieck & Gill, Seymour, IN, Attorney for Appellant.

James D. Johnson, Rudolph, Fine, Porter, Johnson, LLP, Evansville, IN, Attorney for Amicus Defense Trial Counsel of Indiana.

John Joseph Tanner, Andrea Roberts, Catherine A. Meeker, Baker & Daniels, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Judge.

Nearly six years after we first issued an opinion in this action, this case is before us once again. Appellant-plaintiff Steven Lytle, appeals the entry of summary judgment granted in favor of appellee-defendant Ford Motor Company (Ford) on his product liability claim against Ford for defective seatbelt design, alleging that the trial court erred in determining that evidence submitted by Lytle's expert witnesses based on their observations and deductive reasoning was insufficient to oppose Ford's "technical and scientifically relevant evidence based on reliable scientific principles." Appellant's Br. p. 9. More specifically, Lytle argues that the trial court erred in its application of Indiana Evidence Rule 702, that it improperly granted Ford's motion to strike several affidavits and other exhibits on relevancy grounds and that it had improperly weighed the evidence at the summary judgment stage of the proceedings. Concluding that the trial court properly granted Ford's motion for summary judgment, we affirm.

## FACTS [1]

As we reported in *Lytle v. Ford Motor Co.*, 696 N.E.2d 465 (Ind.Ct.App.1998), *trans. denied*, the relevant facts of this case are as follows:

On August 31, 1987, Lytle, his wife Kyong and their daughter Michelle were riding in their 1987 Ford Ranger pickup truck when it was struck by another vehicle. The force of the collision caused their truck to skid and roll over several times. Although Lytle contends that Kyong was wearing a seat belt at the time of the accident, she was thrown from the truck. As a result, Kyong suffered permanent brain damage, while Lytle and Michelle, who were restrained by their seat belts, incurred only minor injuries.

In August of 1989, Lytle filed a complaint against Ford, alleging that Kyong's enhanced injuries were caused

---

1. We heard oral argument in this case on July 13, 2004 in Indianapolis.

by a design defect in Ford's seat belts. Specifically, Lytle alleged that the seat belt buckle inertially released as a result of the acceleration forces which occurred during the accident. In the alternative, Lytle alleged that the improper placement of the seat belt buckles combined with the ease with which Kyong's buckle could be released, caused it to inadvertently release when it came in contact with either Michelle's body or clothing or her buckle. In response, Ford filed an answer denying Lytle's allegations, contending that its seat belt design was not defective and that Kyong was not wearing her seat belt at the time of the accident.

On August 23, 1996, Ford filed a motion in limine seeking to exclude evidence of any design defects other than those relating to inadvertent release, inertial release or defects in the passenger door. Record at volume 8: page 1858. On September 19, 1996, during the hearing on Ford's motion in limine, Lytle's attorney informed the court that, "the only issue concerns the buckle and in that regard its [sic] simply the design of the buckle, the selection of this particular buckle compared to other safer alternative designs, and the failure to test the buckles." R. at 39:9057. Thereafter, the trial court granted Ford's motion, concluding that the only issues remaining concerned the buckle's design and selection and Ford's failure to properly test the buckle. R. at 13:2889.

On August 23, 1996, Ford also filed a motion in limine seeking to exclude the testimony of Lytle's expert witnesses, Billy Peterson and John Marcosky. Specifically, Ford contended that Peterson's testimony regarding inertial release was not scientifically reliable and would not assist the trier of fact. Ford further argued that any probative value that the testimony would provide would be substantially outweighed by the prejudice to Ford. Additionally, Ford contended that Marcosky's testimony regarding inertial and inadvertent release "was not based on reliable analysis or knowledge and would not assist the trier of fact." R. at 8:1879. In September of 1996, after a hearing on the motion in limine, the trial court entered an order excluding Marcosky's testimony because Lytle failed to demonstrate that the testimony was based upon any particular skill, knowledge, experience or expertise or that it would assist the jury. R. at 13:2891–92. The trial court also excluded Peterson's testimony regarding inertial release because he could not show that the forces and circumstances which were present during his pendulum tests and which permitted the seat belts to inertially release, were sufficiently similar to the forces and circumstances which are present in a "real world" accident, or which were present during the Lytle's accident. R. at 13:2926–28.

Following the court's ruling, during an offer of proof, Peterson testified that his pendulum tests demonstrated that inertial release can occur at less than peak acceleration of between 40–60 g forces. Therefore, he argued, because Ford's tests had demonstrated that buckles could be exposed to forces of 40–60 g's during a real world accident, his tests proved that a seat belt could inertially release during a real world accident. However, the court again ruled that his testimony was inadmissible, finding that Lytle had failed to establish that the forces present during Peterson's tests were similar enough to forces which are present in a real world accident.

On October 7, 1996, Ford filed a motion for summary judgment, alleging that, without testimony from Marcosky and Peterson, Lytle could not establish a

genuine issue of material fact regarding design defect and causation. Thereafter, Lytle filed a motion in opposition to summary judgment, in which he argued that the testimony of his expert witnesses was admissible. Nevertheless, the trial court granted Ford's motion for summary judgment and incorporated its previous rulings excluding Peterson's testimony. The court also found that Lytle had abandoned his claim for inadvertent release, that Marcosky's and Peterson's testimony regarding inertial release was inadmissible and that, without expert testimony, Lytle presented no genuine issue of material fact regarding defect, a safer alternative design or causation.

*Id.* at 467–68. In deciding the first *Lytle* appeal, we held, among other things, that the trial court erred in determining that Lytle had abandoned his theory of inadvertent release. However, we also concluded that the trial court properly excluded Peterson's and Marcosky's testimony regarding inertial release and, therefore, the trial court properly granted summary judgment on this theory. We also determined that even though expert testimony from Marcosky was properly excluded regarding inadvertent release, it was also demonstrated that the trial court did not exclude Peterson's testimony on this theory. As a result, we remanded the cause with instructions that the case should proceed on Lytle's theory of inadvertent release. *Id.* at 474.

Following the appeal, Ford filed a second motion for summary judgment and motions in limine on May 16, 2001, to exclude the expert testimony of Billy Peterson and Thomas Horton. Sometime thereafter, Peterson died and Lytle retained Dr. Anil Khadilkar as an expert witness. Ford's second motion for summary judgment was held in abeyance and, following additional discovery, the compa-

ny filed a third motion for summary judgment on October 2003, seeking to exclude all of Lytle's expert witnesses.

Ford contended that it was entitled to judgment as a matter of law because its uncontradicted expert testimony established that the seatbelt assemblies in the Ford Ranger were not defectively designed, and Lytle failed to present any evidence to contradict that theory. Appellant's App. p. 417. Along with the motion for summary judgment, Ford sought to exclude Lytle's expert witnesses on the grounds that their testimony was inadmissible and not scientifically reliable with respect to the issue of Ford's alleged negligence or design defect. Moreover, Ford contended that even if the proposed expert testimony could be admitted, summary judgment should still be granted because Lytle failed to put forth any evidence demonstrating that the seatbelt assemblies were defective or that feasible, safer, and more practical designs were available and would have afforded better protection. Ford also alleged that Lytle's designated evidence failed to establish that there were alternative designs that could have prevented the injury and that the specific injuries to Mrs. Lytle were proximately caused by the alleged defective seatbelt assemblies.

Following a hearing, the trial court granted Ford's motion to strike several of Lytle's exhibits and affidavits, and proceeded to enter summary judgment for Ford. It was determined that, for purposes of summary judgment, the seatbelt was in fact latched and was in the proper position. The trial court then noted that in order to support Lytle's contention of a design defect, sufficient expert testimony had to be presented. That is, scientific testimony of a technical nature was required that had to be based upon scientific principles. Moreover, the trial court held that the causal

link between the design defect and the injury that Lytle suffered also had to be established by scientific evidence.

The trial court went on to observe that Lytle failed to present sufficient evidence in accordance with Indiana Evidence Rule 702(b) to withstand Ford's motion for summary judgment. In essence, the trial court observed that neither Horton nor Dr. Khadilkar performed any testing, and there was no credible expert testimony that was based on reliable scientific principles that their theory could work in the real world and was what, in fact, occurred in Lytle's vehicle. In other words, the trial court reasoned that the inferences Lytle was attempting to draw were not based on scientific principles. Rather, it was concluded that those inferences were merely based upon observation and deductive reasoning.

With respect to the theory of inadvertent unlatch, the trial court observed that there are no reported publications, no reported peer reviews, no reported experiments or testing demonstrating that inadvertent unlatch as claimed by Lytle occurs in the real world. Moreover, the trial court determined that Lytle's witnesses have not satisfied any of the criteria set forth in *Daubert*.[2] Hence, it concluded that the expert testimony offered by Lytle's witnesses was scientifically unreliable and could not be admitted in accordance with our rules of evidence.

On the other hand, the trial court concluded that Ford's witnesses documented their testing, demonstrated that their theories, tests, and techniques can be repeated and replicated, that findings have been published with regard to this case, and the methodology that they followed is well-accepted in the technical and scientific community concerned with automobile safety issues. Inasmuch as Lytle was unable to present any technical and scientifically relevant evidence based on reliable scientific principles that would create a genuine issue of material fact in opposition to Ford's summary judgment motion, the trial court concluded that summary judgment for Ford was proper.

Additionally, the trial court determined that there was no issue of express warranty, as it had been dismissed from the pleadings years ago, and that there was no allegation of a breach of warranty claim in the amended complaint filed in 1996. There was also no testimony or other evidence to support that theory. Also, because the issue of compensatory damages was decided adversely to Lytle, no question as to punitive damages could be submitted to the trier of fact. Thus, summary judgment was also entered on the claim of punitive damages. Lytle now appeals the grant of summary judgment in favor of Ford.[3]

## DISCUSSION AND DECISION

### I. Standard of Review

In reviewing the trial court's grant of summary judgment, this court stands in

---

**2.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *cert. denied*, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126. While not presuming to set out a definitive checklist or test regarding factors which bear on the reliability inquiry, the *Daubert* court outlined the following key considerations: (1) whether the theory or technique at issue can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique is generally accepted within the relevant scientific community. *Id.* at 2796–97.

**3.** On June 24, 2004, this court granted the Defense Trial Counsel of Indiana's motion to file an amicus brief in this case.

the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *Smith v. Allstate Ins. Co.*, 681 N.E.2d 220, 223 (Ind.Ct.App.1997). We do not weigh evidence but will liberally construe the facts in the light most favorable to the nonmoving party. *General Motors Corp. v. Northrop Corp.*, 685 N.E.2d 127, 132 (Ind.Ct.App.1997), *trans. denied*. Summary judgment should be granted only when the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). On appeal, we must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court. *City of Elkhart v. Agenda: Open Government, Inc.*, 683 N.E.2d 622, 625 (Ind.Ct.App.1997), *trans. denied*. The party appealing the grant of summary judgment has the burden of persuading this court on appeal that the trial court's ruling was improper. *Jordan v. Deery*, 609 N.E.2d 1104, 1107 (Ind.1993). We also note that where expert testimony is advanced to establish causation, summary judgment is properly entered in favor of the defendant where that testimony fails to meet the admissibility requirements of Indiana Evidence Rule 702. *Hottinger v. Trugreen Corp.*, 665 N.E.2d 593, 595 (Ind. Ct.App.1996), *trans. denied*.

## II. Indiana Rules of Evidence

In addressing Lytle's claims that granting summary judgment for Ford was error, we first note the provisions of Indiana Evidence Rule 702:

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

In interpreting this rule, this court recently reaffirmed the notion that an expert must be qualified by knowledge, skill, experience, training or education. *Messer v. Cerestar USA, Inc.*, 803 N.E.2d 1240, 1247 (Ind.Ct.App.2004), *trans. denied*. Additionally, an expert must have sufficient skill in the particular area of expert testimony before an opinion may be offered in that area. *Armstrong v. Cerestar U.S.A., Inc.*, 775 N.E.2d 360, 365 (Ind. Ct.App.2002), *trans. denied*. Moreover, an expert in one field of expertise cannot offer opinions in other fields absent a requisite showing of competency in that other area. *Hegerfeld v. Hegerfeld*, 555 N.E.2d 853, 855–56 (Ind.Ct.App.1990).

We also note that the proponent of expert testimony bears the burden of establishing the foundation and reliability of the scientific principles and tests upon which the expert's testimony is based. *Hannan v. Pest Control Services, Inc.*, 734 N.E.2d 674, 679 (Ind.Ct.App.2000), *trans. denied* (citing *McGrew v. State*, 682 N.E.2d 1289, 1290 (Ind.1997)). Evidentiary rulings, including a decision to exclude expert testimony, lie solely within the trial court's discretion and will not be reversed absent an abuse of that discretion. *Hannan*, 734 N.E.2d at 679.

As we observed in the first *Lytle* opinion,

[W]here an expert's testimony is based upon the expert's skill or experience rather than on the application of scientific principles, the proponent of the testi-

mony must only demonstrate that the subject matter is related to some field beyond the knowledge of lay persons and the witness possesses sufficient skill, knowledge or experience in the field to assist the trier of fact to understand the evidence or to determine a fact in issue. Evid. R. 702(a); *Corbin v. State,* 563 N.E.2d 86, 92–93 (Ind.1990). However, when the expert's testimony is based upon scientific principles, the proponent of the testimony must also establish that the scientific principles upon which the testimony rests are reliable. Evid. R. 702(b).

*Lytle,* 696 N.E.2d at 469–470.

■ In light of the above, it is apparent that Indiana Evidence Rule 702 assigns to the trial court a "gatekeeping function" of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. *Hottinger,* 665 N.E.2d at 596. When faced with a proffer of expert scientific testimony, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Id.* Scientific knowledge admissible under Indiana Evidence Rule 702 connotes more than subjective belief or unsupported speculation. *Id.* Thus, expert testimony must be supported by appropriate validation or "good grounds" based on what is known, establishing a standard of evidentiary reliability. *Steward v. State,* 652 N.E.2d 490, 498 (Ind. 1995). Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be empirically tested. *Hottinger,* 665 N.E.2d at 596. Another pertinent consideration is whether the theory or technique has been subjected to peer review

and publication. *Id.* Widespread acceptance can be an important factor in ruling whether particular evidence is admissible under Indiana Evidence Rule 702, and a technique which has attracted only minimal support may properly be viewed with skepticism. *Id.* We also note, however, that while such factors are useful, there is no specific "test" or set of "prongs" which must be considered in order to satisfy the requirements of Indiana Evidence Rule 702(b). *Wallace,* 730 N.E.2d at 813.

Pursuant to the assertion that summary judgment for Ford must be reversed, Lytle cites cases indicating that the term "reliability" in accordance with Indiana Evidence Rule 702 may be established by judicial notice or by a sufficient foundation to convince a trial court that the relevant scientific principles are, in fact, "reliable." *Rogers v. Cosco, Inc.,* 737 N.E.2d 1158, 1168 (Ind.Ct.App.2000), *trans. denied.* Quoting from *Malinski v. State,* Lytle states that a *Daubert*-type analysis is not applicable where expert testimony is more a "matter of the observations of persons with specialized knowledge" rather than "a matter of scientific principles." 794 N.E.2d 1071, 1084 (Ind.2003).

To illustrate, in *Malinski,* our supreme court considered the testimony of a pathologist as to the mental condition of a victim depicted in a series of photographs. His opinion was based solely upon his review of photographs of the victim in bondage. Specifically, the expert witness determined that based upon his forensic training and the photographs that he had reviewed, the victim was an unwilling participant and had been incapacitated. In holding that the admission of this testimony was not error, our supreme court reasoned that the expert's opinion was not a matter of "scientific principles" under Indiana Evidence Rule 702(b), but was expert testimony based on "specialized knowledge." *Id.*

However, there was no hypothesis involved as to how some extremely complex physical event might have occurred.

In another case, *PSI Energy, Inc. v. Home Insur. Co.,* 801 N.E.2d 705, 740–41 (Ind.Ct.App.2004), *trans. denied,* the defendants argued the theory regarding leakage and environmental contamination from subsurface containment structures could not be empirically tested. The trial court had denied a motion to strike the testimony of an expert witness involving the cause of leaks from subsurface containment structures. Specifically, it was noted that the theory had not been peer-reviewed or even written down. Moreover, it was demonstrated that the particular theory had not been heard of in the relevant scientific community. *Id.* at 740.

In determining that the trial court did not abuse its discretion in denying the motion to strike the testimony, this court determined that the expert's theory was based upon relatively simple concepts and "reliably based on his observations and application of his specialized knowledge to those observations." *Id.* at 741. We also observed that the expert's opinion as to the leakage was admissible because "the concepts relied upon, such as vibrations from a passing train, are relatively simple and within the knowledge of a common layperson." *Id.*

In light of these cases, Lytle contends that Indiana law applies a different criteria in distinguishing between testing and the like based on "scientific principles," and expert testimony based on "skilled observations." He argues that in the previous *Lytle* case, we differentiated between expert testimony regarding inadvertent release and inertial release of the restraint system. *Id.* at 470. In particular, Lytle asserts that we reviewed expert testimony regarding inadvertent release and recognized that the experts had relied on *obser-*

*vations* of the buckle, the configuration of the buckles in the vehicle, as well as their *knowledge and experience,* rather than on scientific principles or testing. *Id.* (Emphasis added).

Quoting from *Lytle,* we observed that:

[W]here an expert's testimony is based upon the expert's skill or experience rather than on the application of scientific principles, the proponent of the testimony must only demonstrate that the subject matter is related to some field beyond the knowledge of lay persons and the witness possesses sufficient skill, knowledge or experience in the field to assist the trier of fact to understand the evidence or to determine a fact in issue.

*Id.* at 469–70.

### III. Expert Witnesses

#### A. Thomas Horton's Testimony

Turning to the specific arguments relating to the testimony of Lytle's expert witnesses, Lytle asserts that Horton's testimony regarding the concept of inadvertent release is a question of geometry and that it was based on observation of the buckle, the configuration of the seat belt systems in the Ford Ranger, along with Horton's knowledge and experience. Therefore, Lytle contends that Horton's testimony should have been admitted. Lytle points out that Horton confirmed by examination that either extending the length of the center buckle two inches or switching to end release buckles would have prevented the inadvertent release of the buckle that allegedly occurred in this accident.

With regard to the testing procedures employed, it was demonstrated that Horton had replaced the buckles with end release buckles and confirmed that, with those types of buckles, any contact would

not involve contact with the pushbutton of the outboard passenger's end release buckle. Appellant's App. p. 336–37. In light of that opinion, Lytle maintains that "the design defect and alternatives in this case are proven not by testing, but from skilled observation, common sense, knowledge and experience." Appellant's Br. p. 21.

Lytle urges that the criteria set out by this court in the first appeal requires that Horton have specialized knowledge, skill, experience, training, or education regarding the issue involved and that his specialized knowledge assist the trier of fact to understand the evidence or to determine a fact in issue. Lytle did establish that Horton was educated and trained as a mechanical engineer, and that he had been responsible for vehicle restraint system design, development and analysis as an engineer for General Motors from 1977 to 1987. Further, Lytle showed that Horton was employed by TRW, Inc., a seat belt manufacturer, from 1987 to 1994, and his positions involved direct knowledge of a variety of restraint system components, including end release and side release buckles. Also, since 1996, Horton has been the principal engineer at Horton & Associates where he serves as a consultant on safety restraint systems. Thus, Lytle contends that in light of his education and employment record, Horton has gained specialized knowledge, training and experience regarding the design, performance, and analysis of seat belt systems. Hence, Lytle argues that Horton's testimony was certainly relevant as to whether Mrs. Lytle was wearing her seat belt, whether and how it unlatched, and whether Ford negligently designed the belt.

Lytle also notes that because several witnesses remarked that the passenger belt was hanging out of the passenger side window after the accident, Horton was able to explain how such remarks were consistent with use, release, retraction and how the seat belt could have become unlatched. Therefore, Horton was also able to explain that the buckles in Lytle's vehicle did not conform to good engineering practice. That is, Horton was of the opinion that an automaker using reasonable care at the time that Lytle's vehicle was designed and manufactured would have considered and avoided the type of geometric configuration that had been used in the production of the Ford Ranger. Horton has also testified that safer, feasible, and more practical designs were available to Ford that would have prevented the passenger from being ejected from the vehicle. As a result, Lytle concludes that Horton's testimony was based on the "observation of a person with specialized knowledge," that was beyond the knowledge of lay persons and, therefore, the trial court erred in requiring Lytle to present scientific testimony under Indiana Evidence Rule 702(b) in opposition to Ford's motion for summary judgment.

In addressing these contentions, it is apparent from the record that Horton simply twisted and pushed two seatbelts together without any evidence that the accident could have resulted in the same forces, direction, duration, rotations, or load conditions as his manipulations. Ford says—and we agree—that proof of "inadvertent unlatch" should require a specific scientific analysis, the same as we required with regard to the theory of "inertial release." To be sure, as we recognized in *Lytle I*, the testimony of one of the expert witnesses had to be excluded because Lytle failed to demonstrate that there was any moment when the necessary combination of webbing tension, force and duration to release the buckle was possible in a rollover.

For these same reasons, we agree with the trial court's conclusion that Horton's testimony also had to be excluded. In our view, the *possibility* that an inadvertent unlatch occurred in this accident depends on a similar convergence of all of the variables addressed above: a particular direction of movement and rotation of the belt assemblies, coupled with the proper force and webbing load, all for the appropriate duration. Put another way, given the evidence in this record, we cannot see how the convergence of all of these variables at a precise moment in time can simply be "observed."

We also note that the circumstances in both *Malinski* and *PSI* differ significantly from those presented here, inasmuch as the expert witnesses in those cases simply assisted the trier of fact based on his or her greater skill, knowledge or experience, to evaluate physical evidence that was already before the trial court. Here, there is simply no way for a jury to determine whether what Lytle says happened in the vehicle during the accident sequence *actually* occurred. There are no pictures of cracks or footprints or microscope slides that a jury could examine in order to draw its own conclusion. Rather, there are only the facts of the accident and the injuries, along with the opinions offered by the parties' experts.

In *Messer v. Cerestar USA, Inc.*, expert testimony was barred regarding the failure of a safety gate in accordance with Indiana Evidence Rule 702(b). In *Messer*, the evidence established that the gate was designed for removal by lifting it upward and out of a U-shaped bracket where it rested. Eyewitness testimony indicated that when Messer leaned over it, the gate simply "slid out of the cups and down [Messer] came." 803 N.E.2d 1240, 1244–45 (Ind.Ct. App.2004), *trans. denied*. The plaintiff's expert concluded that the gate failed "be-

cause it was unable to withstand two-hundred pounds of pressure and remain fixed in place." *Id.* at 1248. On appeal, we reversed the trial court's decision to admit the expert's testimony that had been submitted by way of affidavit. We held that the plaintiff had failed to demonstrate that the affidavit rested upon reliable scientific principles, and it "did not reveal what scientific method or principles were used to arrive at the conclusion that the gate was defective." *Id.* at 1247–48. Additionally, there was no indication that the expert "took any measurements, performed any analysis, or even viewed the gate and accident scene." *Id.* at 1247–48. Thus, we concluded that "the opinion is unsupported speculation or subjective belief . . . and the affidavit should not have been admitted." *Id.* at 1248.

Following the rationale set forth in *Messer*, it is apparent that Lytle's experts have concluded that the seatbelt was defective based only on their hypotheses as to what might have occurred during the accident. On the other hand, in both *Malinski* and *PSI*, the experts' opinions were rooted in observations of physical evidence such as a shoe print, bondage photographs, a cell under a microscope, a bullet wound, or a crack in concrete. As we observed in *Messer*, we must conclude that Horton's purported expert testimony failed to comply with Indiana Evidence Rule 702(b), inasmuch as Lytle failed to show that his opinions were based upon reliable scientific principles.

That said, however, we note that there were certain aspects of Horton's testimony that were susceptible to mere observation, including: (1) the fact that two seat belt buckles are in close proximity to each other; (2) the relative length and position of the buckle stalks; and (3) the fact that some release buttons are more difficult to depress than others. Nonetheless, these

circumstances indicate that a layperson is just as capable of evaluating the evidence and reaching the conclusions that Horton did on these points. Hence, we reject the notion that Horton could rely upon general principles of physics alone to establish the necessary conclusions to defeat summary judgment. To be sure, the trial court could reasonably conclude that force, duration, direction, tension and rotation during an accident sequence like what had occurred with the Lytles involve complex scientific variables that cannot be merely "observed."

By way of further explanation, it is clear that Horton sought to present the following opinions to the jury: (1) the geometry of the passenger's and center occupant's seatbelt assemblies in the vehicle permits sufficient contact between the shoulder of the latch plate of the center occupant's assembly and the button of the passenger's buckle when both seatbelts are in use to unlatch the passenger's buckle; (2) the accident that occurred here created forces sufficient to move the assemblies worn by Michelle and Kyong in a manner that caused the shoulder of Michelle's latch plate to twist, move toward, and then depress the button on Kyong's buckle with forces sufficient to open the buckle at a time when no belt load tensions were present; and (3) two safer alternative seatbelt designs were available to Ford.

In examining these proposed opinions, it is apparent that Horton's leap from his observations to such conclusions amounts to mere speculation. Horton's opinions are based only on (1) his examination of the vehicle and seatbelt assemblies, including the placement and photography of two people in an exemplar vehicle in 2003, and (2) his uninstrumented hand manipulations of two exemplar assemblies, unattached to any vehicle, and without passenger load or any web tension whatsoever. Appellant's

App. p. 1649–52, 1655–56, 1665–67. Horton acknowledged in his deposition testimony that he could not replicate the force, direction or duration of the contact, the rotation of the belts or the web tension of the belts to achieve what he considered the "inadvertent unlatch." To be sure, Horton was not able to replicate the types of forces that are involved when a vehicle strikes the side of a pickup truck at the time that an individual is traveling on the roads. Moreover, Horton had performed no testing to support his theory that a longer center buckle stalk was a safer alternative design, and he had not done any testing and had no support for his opinion that the other buckle was a safer alternative design. Appellant's App. p. 55–56. In light of such a significant analytical gap between Horton's data and his conclusions, his testimony was unreliable as a matter of law, and we must conclude that the trial court properly excluded his testimony.

### B. Dr. Khadilkar's Testimony

In a similar vein, Lytle goes on to argue that Dr. Khadilkar's testimony was admissible and relevant because it was based upon his specialized knowledge and skilled observations. As with Horton, the record shows that Dr. Khadilkar's testimony regarding inadvertent unlatch was based primarily on observation and analysis of the geometry of the restraint system and its alternatives. Dr. Khadilkar concluded as follows: "the potential for buckles to unlatch from inadvertent contact increases when two or more people are adjacent to each other in a vehicle and when the geometry of the restraint system places one buckle immediately adjacent to another as is the case of the restraint system in the Lytles' [vehicle]." Appellant's App. p. 646. Lytle contends that such an opinion should have been admitted because the designated evidence es-

tablished that Dr. Khadilkar possessed specialized knowledge, skill, training and experience regarding design and configuration of seat belt systems, and that his opinions regarding inadvertent release would assist the trier of fact.

Lytle sets forth Dr. Khadilkar's educational and employment accomplishments, and notes that he has conducted hundreds of static and dynamic crash tests including compliance and certification testing and research on school buses and passenger vehicles. Appellant's App. p. 285–86, 296. Moreover, Lytle showed that Dr. Khadilkar has conducted testing on over twenty models of side-release and end-release safety belt buckles. Appellant's App. p. 296. In light of these accomplishments and experience, Lytle urges that Dr. Khadilkar's testimony would assist the jury in determining whether Kyong was wearing her seat belt at the time of the collision, whether it unlatched allowing her to be ejected, and whether Ford negligently manufactured and sold the vehicle. Dr. Khadilkar also explained the physics that were involved and, taking into account the speed of the vehicle and forces in the accident and other factors, he determined that there was sufficient force in the collision to release the buckle. Because Dr. Khadilkar examined Ford's test results as well as the type of restraint system that was used in the Lytles' vehicle and the alternatives that were available at the time, coupled with his knowledge and understanding of the forces in a rollover sequence, Lytle urges that Dr. Khadilkar's specialized knowledge of restraint systems and rollovers would assist the trier of fact in this case, and his testimony should have been admitted.

As with Horton's testimony, Lytle fails to show that Dr. Khadilkar satisfied the reliability test with regard to his testimony. That is, Dr. Khadilkar never documented the amount of depression that was necessary to release the seatbelt buckle in the accident. Additionally, even though Dr. Khadilkar authored an affidavit and two expert reports, he never identified a reliable basis for his conclusion. It is also noteworthy that Dr. Khadilkar did not perform any research, and he did not identify any literature in support of his theory.

In our view, the distinction that Lytle attempts to draw between the provisions of Indiana Rules of Evidence 702(a) and 702(b) simply is not helpful to him. That is, Rule 702(a) requires that expert testimony must assist the trier of fact to understand the evidence or to determine a fact in issue. *PSI Energy, Inc.,* 801 N.E.2d at 738–39. Under Indiana Evidence Rule 702(a), *all* expert testimony, and not merely "scientific" testimony subject to Rule 702(b), must be reliable and relevant to the issues under consideration. *See id.* at 739. The record before us shows that Dr. Khadilkar engaged in less than ten minutes of "testing" to reach his opinion: he placed a buckle against a table in his office and "eyeballed" the depression necessary to release the latchplate. Appellant's App. p. 1833–35, 1846. The record is devoid of any indication that Dr. Khadilkar made an effort to measure the force, web tension, direction or rotation that would occur in this type of accident. Moreover, Dr. Khadilkar did not favor the trial court with any other evidence establishing that the seatbelt assemblies moved toward one another, moved with any particular force or load, twisted into position, or that any other object contacted the passenger's button at all, let alone with sufficient force, direction, duration, rotation, and load conditions to release the buckle. As with Horton's testimony, we are compelled to conclude that the trial court properly excluded Dr. Khadilkar's testimony.

### III. Scientific Evidence to Prove Causation

Notwithstanding our discussion above, Lytle goes on to argue that scientific testing is not required to prove causation and cites *Taylor v. State*, 710 N.E.2d 921, 923–24 (Ind.1999), for this proposition. In *Taylor*, a pathologist testified as to the position of the shooter based on his examination of the victim pursuant to Indiana Evidence Rule 702(a). Lytle observes that our supreme court did not require scientific testing to replicate the incident. *Id.* He also directs us to *Dartey v. Ford Motor Co.*, 104 F.Supp.2d 1017 (N.D.Ind.2000), where a Federal District Court permitted a metallurgist to testify regarding his theory about how cables on a truck tailgate broke, even though he had not conducted any testing of his theory. In light of these decisions, Lytle maintains that the requirement of testing to prove that inadvertent release happens—and in fact happened in this accident—conflicts with Indiana law. *Id.* Thus, inasmuch as Horton and Dr. Khadilkar testified it was not a good engineering practice for Ford to have placed a vehicle into commerce with its belt buckles immediately adjacent to each other, which allowed the buckles inadvertently to make contact, inadvertently release, and that other alternatives existed, it was error to grant summary judgment for Ford.

In light of our above discussion, we hold that the trial court accurately applied the established principles when analyzing the proposed expert testimony regarding a nexus between the data and the accident. In short, the trial court properly required Lytle to demonstrate the reliability of his proposed expert testimony. And this, Lytle has failed to do.

### IV. Exclusion of Exhibits

Lytle also claims that the trial court erred in excluding a number of exhibits he offered in opposition to Ford's motion for summary judgment. Specifically, Lytle claims that the exclusion of several affidavits offered by his witnesses was error and that the trial court erroneously concluded that "one cannot determine from the affidavits alone whether the information contained therein is based on the party's own individual knowledge or whether the content of the affidavits are based on knowledge acquired from some source other than the person's own observations or experiences." Appellant's Br. p. 31.

In resolving this issue, we note that a trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *Vega v. State*, 656 N.E.2d 497, 502 (Ind.Ct.App.1996), *trans. denied.* Such an abuse occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances of the case, or if it misinterprets the law. *Vernon v. Kroger Co.*, 712 N.E.2d 976, 982 (Ind. 1999). However, we also observe that evidentiary material used in association with a motion for summary judgment must set forth only information that would be admissible at trial. Ind. Trial Rule 56(E); *Cromer v. Sefton*, 471 N.E.2d 700, 705–06 (Ind.Ct.App.1984). When a court reviews a motion for summary judgment, all inadmissible evidence in either supporting or opposing affidavits should be excluded from consideration. *Matter of Belanger's Estate*, 433 N.E.2d 39, 43 (Ind.Ct.App. 1982).

Here, Lytle maintains that Michelle's affidavit constitutes direct evidence that Kyong was wearing her seatbelt at the time of the accident. Appellant's App. p. 174. Affidavits submitted by other witnesses established that immediately after the accident, the seat belt was extended and out of the cab. Appellant's App. p. 324–25. Steven Lytle's affidavit demonstrated that the buckle was relatively new and in working order before the accident

occurred. Appellant's App. p. 352. Therefore, contrary to the trial court's ruling, Lytle maintains that the affidavits represent every indication of personal knowledge. That is, each affidavit amounted to a recitation of what the witness said, saw or did, it was error to have excluded these exhibits.

Lytle also urges that the trial court erroneously excluded the trim installation manual for a 1986–87 Ford Ranger front seat from the evidence. The trial court found that the manual "really offer[s] no credible evidence of probative value to assist the Court in determining the issues that needed to be determined." Appellant's App. p. 1153. The manual shows the belt for the center seat occupant buckle approximately six inches longer than the stalk for the adjacent passenger side buckle. Lytle claims that this exhibit at least shows awareness by Ford engineers of the need for different lengths for the center seat occupant belt and the adjacent stalk, and it supports the experts' opinions where they suggested that the seatbelt stalks should have been "staggered" which would have resulted in an alternative, safer design. Appellant's Br. p. 33. Thus, Lytle contends that this exhibit should have been admitted.

Additionally, Lytle contends that the trial court erred in excluding two other exhibits purportedly establishing that Ford's buckles were releasing in the "real world." Appellant's Br. p. 34. Specifically, Exhibit OO consisted of computer reports from Ford's database, which included reports that "seatbelt button released because the protruding button pushed against something during the accident." Appellant's App. p. 911. The exhibit purportedly established that customers were injured when their seatbelts released when the vehicle rolled over, customers were thrown from the vehicle during accidents when their belt released and, in some instances, children were thrown from their car seats when the seatbelt released. Appellant's App. p. 911, 915–916, 937.

The other item—exhibit PP—that was excluded contains Ford documentation of European standards and testing. Included in the exhibit were documents showing: "there is buckle head and recline wheel contacts, which during testing caused the current production buckle ... to release the tongue. This condition was overcome by increasing the buckle stalk length by 40 mm." Appellant's App. p. 960. Hence, Lytle contends that he established through these exhibits that Ford's buckles were releasing "in the real world." As a result, Lytle makes the point that the exhibits stand in sharp contrast to Ford and the trial court's conclusion that nothing suggests that inadvertent unlatch occurs. Therefore, Lytle urges that the exhibits should not have been excluded, and the opinions of Lytle's experts should not have been stricken. The trial court's ruling with respect to the exclusion of these exhibits is as follows:

> Exhibits OO and PP were exhibits, that, again, standing alone were not understandable or decipherable by the Court. While they were mentioned or alluded to in depositions and affidavits they were never explained or referenced in such a way that they were made understandable to the Court in the materials submitted in support of the Motion for Summary Judgment.... In addition thereto Exhibits OO and PP did not directly bear upon the issues decided by the Court which disposed of the Motion for Summary Judgment.

Appellant's App. p. 1153.

▮ With regard to the striking of the affidavits, we note that it is assumed at this stage of the proceedings that Kyong had, in fact, fastened her seatbelt. Thus,

the affidavits were not relevant to the trial court's ruling on summary judgment. Even so, our review of the record reveals that the affidavits had not been properly verified, they contained hearsay as well as statements outside the personal knowledge of the witnesses, and there was a lack of foundation for the ultimate conclusions regarding identification of the passenger seatbelt webbing. Appellant's App. p. 1095–96, 1101–02, 1106–07. Therefore, the statements contained in the affidavits were inadmissible on this basis, as well.

■ With regard to exhibits OO and PP, it is apparent that those documents are all grouped together without authentication, foundation, or explanation. Additionally, the complaints made to Ford occurred in 2002 and 2003, more than fifteen years after the Lytle accident had occurred. Even more compelling, Lytle fails to demonstrate that any of the complaints concerned a 1987 Ford Ranger or the particular type of seatbelt that was used in the accident. As a result, there is no connection between these exhibits and Lytle's contention that the buckle in this accident inadvertently unlatched. Thus, the trial court did not err in excluding these exhibits.

### V. Improperly Weighing the Evidence

■ Last but not least, Lytle argues that the trial court erred in relying upon Ford's crash testing and also maintains that it erroneously concluded that the testing disproved Lytle's experts' theory of defect in granting summary judgment for Ford. In essence, Lytle contends that the trial court's statement that "exemplars of the seat belt system had been tested and the plaintiff's theory could not be replicated," amounted to an improper weighing of the evidence. Appellant's Br. p. 36. Lytle additionally claims that the trial court's conclusion that "Plaintiff's theory could not

be replicated" is contrary to the facts. Specifically, Lytle points out that when Ford conducted its crash tests, the Ford Ranger was stationary and only the "bullet" vehicle was moving. On the other hand, both vehicles had been moving when Lytle's accident occurred. Also, the vehicle did not roll in the crash tests, but the designated evidence demonstrated that the Ford Ranger rolled up to five times in the accident. As a result, Lytle urges that "it requires no more than common sense to understand that the chaotic motions of occupants in a rollover will create additional opportunities for buckle contact." Appellant's Br. p. 37. In short, Lytle maintains that Ford presented two crash tests with a stationary Ford Ranger that did not roll, that contained dummies sitting upright that were not certified for side impact or rollover testing. Hence, Lytle argues that the tests Ford conducted in no way disproved Lytle's theory of the case, and the trial court erred in both weighing the evidence and in dismissing Lytle's expert testimony based on Ford's testing.

Contrary to these arguments, it is apparent to us that Ford introduced evidence establishing that the seatbelt assembly was not defective or unreasonably dangerous, thus shifting the burden to Lytle. *See Bushong v. Williamson* 790 N.E.2d 467, 474 (Ind.2003) (observing that once the defendant demonstrates that there are no genuine issues of material fact on any one material element of the plaintiff's claim, the burden shifts to the plaintiff to designate specific facts that reveal that there is a genuine issue of material fact with respect to that element which would require a trial). Ford introduced both laboratory and dynamic crash test evidence that accidents exhibiting the crash characteristics alleged by Lytle do not cause contact between the center seatbelt assembly and the passenger latch plate with the forces,

direction, duration, rotations, and load conditions necessary to cause unlatching. The crash tests that Ford performed demonstrated that the Lytle impact could not have provided sufficient force, and could not have twisted the middle seatbelt buckle sufficiently, with the correct direction, rotation, and force to trigger an accidental release. Ford also introduced evidence that its experts have tested belts under roll conditions and believed that if the belt had inadvertently unlatched, it likely would have become entangled with her arm when she was ejected resulting in marks on the webbing and bruising on her right arm, neither of which occurred.

More specifically, the record shows that Ford, indeed, conducted dynamic crash and rollover tests in substantially similar circumstances to simulate the moment of impact and the roll sequence. Appellant's App. p. 1182, 1183–85, 1406–11, 1427–31, 1438–46, 1551, 1555, 1559, 1592–93, 1598–1601. In particular, Ford conducted two dynamic crash tests in March and April 2001, which demonstrated that the Lytle impact could not have provided sufficient force, and could not have twisted the middle seatbelt buckle sufficiently, with the correct direction, rotation, and force to trigger an accidental release. Appellant's App. p. 1179–82, 1427–31, 1552–55. Ford's experts demonstrated that the passengers and their buckles would move in tandem, and would thus not rotate or resist one another. Appellant's App. p. 1182, 1409, 1555.

Ford also introduced physical evidence that Kyong's seat belt was in a stowed position at the time of the alleged inadvertent unlatching, including (a) expert analysis of plastic transferred from the recliner cover to Kyong's belt in a location not possible if the belt were inadvertently unlatched; (b) expert analysis of the absence of load marks on Kyong's webbing that

would have occurred if the belt had inadvertently unlatched; (c) evidence that a staple in the buckle sheath was not loosened as it would have been during the accident; and (d) the responding officer's testimony and post-accident photographs demonstrating that the belt was in good working order and was stowed following the accident. Appellant's App. p. 1590, 2014, 2050–58, 2237–38, 2244, 2262–64, 2271–72. Additionally, Ford presented evidence establishing that its experts had tested belts under roll conditions, and based on those tests, believed that if Kyong's seatbelt had inadvertently unlatched, it likely would have become entangled with her arm when she was ejected, resulting in marks on the webbing and bruising on her right arm, neither of which had occurred here. Appellant's App. p. 1556–58, 1591–92, 1614–26, 2206–07, 2261–62.

The record also demonstrates that Ford's experts conducted dynamic crash and rollover tests in substantially similar circumstances to simulate the moment of impact and the roll sequence, dynamically tested occupant entanglement by rolling a 1987 Ranger containing a dummy of similar size to Kyong, modeled the accident sequence using state-of-the-art software, and studied the accident site, physical evidence, medical records, and testimony of other witnesses. Appellant's App. p. 1176–85, 1425–33, 1549–59. Ford introduced evidence that neither of Lytle's proposed alternative designs amounted to a safer, more feasible, practical design that would have prevented Kyong's injury. The safety of buckle designs was studied by the National Center for Statistics and Analysis (NCSA), which concluded:

> Having reviewed all the analytical results, there is no pattern of evidence to suggest that side-release systems are less safe than end-release systems. On

the contrary, the ... analysis would suggest that end-release systems may be less safe.... In closing, there is no pattern of evidence in the crash data to support the allegation related to inadvertent unlatching for side-release systems.

Appellant's App. p. 1453.

In light of this evidence, it is apparent that Ford introduced evidence that there is no genuine issue of material fact with respect to the following elements of Lytle's claim: (a) that Ford failed to use reasonable care; (b) that the seatbelt assembly was defective; (c) that the specific injuries were proximately caused by the allegedly defective seatbelt assembly; and (d) that a feasible, safer, and more practical design would have afforded better protection. In our view, the evidence that Ford presented was sufficient to establish grounds for summary judgment. And, as discussed in the issues set forth above, Lytle failed to present admissible evidence on each of the elements of his cause of action to counter Ford's evidence once the burden had shifted to him.

## CONCLUSION

In light of our disposition of the issues set forth above, we conclude that the trial court properly excluded the purported expert testimony of Horton and Dr. Khadilkar, inasmuch as Lytle failed to satisfy the requirements of Indiana Evidence Rule 702. We also note that the trial court did not err in striking the affidavits and excluding the exhibits that Lytle sought to admit in opposition to Ford's motion for summary judgment. Finally, inasmuch as Ford presented evidence sufficient to establish that no genuine issue of material fact existed with respect to Lytle's claims against it, and Lytle failed to offer admissible evidence to counter that evidence in support of his claim against Ford once the burden had shifted to him, we conclude that summary judgment was properly entered for Ford.

The judgment of the trial court is affirmed.

FRIEDLANDER, J., and BAILEY, J., concur.