**Jim KOVACH and Jill Kovach, Individually and on behalf of deceased minor child, Matthew Kovach, Appellants/Cross–Appellees–Plaintiffs,**

**v.**

**ALPHARMA, INC., Alpharma USPD, Inc., Anthony R. Catozzi, Catozzi Corporation, Pharmacy 1 Express, Dynarex Corporation, Medegen Holdings, LLC, Medegen Medical Products, LLC., Medegen, LLC., Medegen Voll-**

rath Group, Vollrath Group, Inc., Premium Plastics, Inc., Micro–Biomedics, Inc., Doe Professional Corporation, Caligor Midwest, Caligor, Inc., and Henry Schein, Inc., Appellees/Cross–Appellants–Defendants.

No. 49A04–0707–CV–406.

Court of Appeals of Indiana.

July 16, 2008.

Rehearing Denied Sept. 17, 2008.

Stephen B. Caplin, Caplin Park, PC, Mark W. Sniderman, Sniderman Law Firm, Indianapolis, IN, Attorneys for Appellants.

Dina M. Cox, Lewis Wagner, LLP, John D. Nell, Matthew W. Adolay, Wooden & McLaughlin, LLP, Indianapolis, IN, Jeffrey Singer, Jason Kennedy, Keith J. Hays, Nancy S. Woodworth, Jill M. Felkins, Segal McCambridge Singer & Mahoney, Ltd., Chicago, IL, Attorneys for Appellees.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellants/Cross–Appellees–Plaintiffs, Jim Kovach (Jim) and Jill Kovach (Jill) (collectively, the Kovachs), individually and on behalf of their deceased minor child, Matthew Kovach (Matthew), appeal the trial court's Orders summarily granting summary judgment in favor of Appellees/Cross–Appellants–Defendants, Caligor Midwest, Caligor, Inc., Henry Schein, Inc., and Micro–Biomedics, Inc. (collectively, Caligor); Dynarex Corporation (Dynarex); Medegen Holdings, LLC, Medegen Medical Products, LLC, Medegen, LLC, Medegen Vollrath Group, and Vollrath Group, Inc. (collectively, Medegen); and Premium Plastics, Inc. (Premium) (all Appellees/Cross–Appellants–Defendants collectively, Cup Defendants).[1]

We affirm in part, reverse in part, and remand for further proceedings.

### ISSUE

The Kovachs raise one issue on appeal, which we restate as follows: Whether the trial court erred by entering summary judgment in favor of the Cup Defendants. On cross-appeal, the Cup Defendants raise one issue, which we restate as follows: Whether the trial court erred by denying the Cup Defendants' Motion to Exclude the opinion testimony of the Kovachs' expert.

### FACTS AND PROCEDURAL HISTORY

On August 8, 2002, Matthew, a nine-year-old child, was admitted to Surgicare, LLC (Surgicare) to undergo a scheduled adenoidectomy. While he recovered in the Post–Anesthesia Care Unit (PACU) of the ambulatory surgery center, Nurse Stormie Cummings Robinette (Nurse Robinette) administered Capital of Codeine, an opiate, to Matthew. To administer the drug, Nurse Robinette used a graduated medicine cup (the Cup), manufactured and/or

1. Defendants Alpharma, Inc., Alpharma USPD, Inc., Anthony R. Catozzi, Catozzi Corporation, Pharmacy 1 Express, and Doe Professional Corporation are not parties to this appeal.

sold by the Cup Defendants. The Cup is made of flexible translucent plastic which is not completely clear and denotes various volume measurement graduation markings, including milliliters (ml), drams, ounces, teaspoons, tablespoons, and cubic centimeters. These measurement markers are located on the interior surface of the Cup and have a similar translucency as the Cup. The vertical distance between the ml volume graduation markings varies: the smallest volume of ml measurement for the graduations between empty and 10ml is 2.5ml; while the smallest volume of ml measurement for the graduations between 10ml and 30ml is 5ml.. The Cup holds 30ml or more of medicine when full.

Matthew was prescribed 15ml, or one-half of the Cup's volume, of Capital of Codeine. Although Nurse Robinette stated that she gave Matthew only 15ml of Codeine, Jim, who was in the room at the time, testified that the Cup was completely full. Matthew drank all of the medicine in the Cup. At 11:20 a.m., he was discharged from Surgicare. Later that day, after arriving home, Matthew went into respiratory arrest. He was transported to Bloomington Hospital, where he was pronounced dead of asphyxia due to an opiate overdose. The autopsy revealed that Matthew's blood contained between 280 and 344 nanograms per ml of Codeine, more than double the recommended therapeutic level of the drug.

On July 2, 2004, the Kovachs filed their Complaint against the Cup Defendants, which they amended on May 19, 2005. In their Amended Complaint, they assert a breach of the implied warranty of merchantability and the implied warranty of fitness for a particular purpose under the Uniform Commercial Code (UCC) and they claim strict liability in tort and negligence under the Product Liability Act. Between July 26, 2005, and February 6, 2006,

each of the Cup Defendants filed motions for summary judgment. On May 1, 2006, the Kovachs filed their Memorandum in Opposition of Summary Judgment and Designation of Evidence. Included in their designated of evidence was the affidavit of the expert witness, James T. O'Donnell (O'Donnell), a pharmacist. On August 4, 2006, the Cup Defendants filed a Motion to ·Exclude the Kovachs' expert witness. In its Order·of June 29, 2007, the trial court granted the Cup Defendants' respective motions for summary judgment and denied the Cup Defendants' motion to exclude O'Donnell's testimony.

The Kovachs now appeal the trial court's grant of summary judgment. The Cup Defendants cross appeal the trial court's denial of their motion to exclude the expert witness. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

On appeal, the Kovachs contend that the trial court erred in entering summary judgment in favor of the Cup Defendants. The Cup Defendants dispute the Kovachs' contentions and additionally initiate a cross appeal asserting that the trial court erred by denying the Cup Defendants' Motion to Exclude the opinion testimony of the Kovachs' expert. Because part of the designated evidence relied upon by the Kovachs in their opposition to the Cup Defendants motions for summary judgment consists of O'Donnell's affidavit, we will first review the Cup Defendants' cross appeal.

### I. ·Cross–Appeal

On cross-appeal, the Cup Defendants contend that the trial court erred by denying the Cup Defendants' Motion to Exclude the opinion testimony of the Kovachs' expert. Generally, they argue that O'Donnell's opinions are speculative, unreliable, and not relevant to the issues at hand.

The Kovachs, as part of their designated evidence, submitted an eleven-page affidavit of O'Donnell in which he describes the particular characteristics of the Cup and formulates several opinions, including that the Cup is defective and unreasonably dangerous as a volume measuring device to administer medications to children and that a cause of Matthew's overdose and subsequent death was the lack of fitness and defective condition of the Cup. In turn, the Cup Defendants submit, in a separate appendix, O'Donnell's deposition testimony. In his deposition, O'Donnell testified to the method used to reach his opinions.

■■■ Ind. Evidence Rule 702, the evidentiary rule concerning expert testimony, provides as follows:

(a) if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Thus, an expert must be qualified by knowledge, skill, experience, training or education. *Fueger v. Case Corp.*, 886 N.E.2d 102, 104 (Ind.Ct.App.2008); *Lytle v. Ford Motor Co.*, 814 N.E.2d 301, 308 (Ind.Ct.App.2004), *reh'g denied, trans. denied.* Furthermore, an expert must have sufficient skill in the particular area of expert testimony before an opinion may be offered in that area. *Lytle*, 814 N.E.2d at 308. An expert in one field of expertise cannot offer opinions in other fields absent a requisite showing of competency in that other area. *Id.*

■■■ The proponent of the expert testimony bears the burden of establishing the foundation and reliability of the scientific principles and tests upon which the expert's testimony is based. *Id.* Where an expert's testimony is based upon the expert's skill or expertise rather than on the application of scientific principles, the proponent of the testimony must only demonstrate that the subject matter is related to some field beyond the knowledge of lay persons and the witness possesses sufficient skill, knowledge or experience in the field to assist the trier of fact to understand the evidence or to determine a fact in issue. *Id.* at 308–09. However, when the expert's testimony is based upon scientific principles, the proponent of the testimony must also establish that the scientific principles upon which the testimony rests are reliable. *Id.* at 309.

■■■ The trial court's function under Evid. R. 702, therefore, is as gatekeeper, ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. *Id.* When expert scientific testimony is proffered, the court must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can be applied to the facts at issue. *Id.* Scientific knowledge, to be admissible, must be more than subjective belief or unsupported speculation. *Id.* Expert testimony, consequently, must be supported by appropriate validation or "good grounds" based on what is known, establishing a standard of evidentiary reliability. *Id.*

■■■ Whether a theory or technique can be empirically tested is one question that will assist in determining whether the scientific knowledge will assist the trier of fact. *Id.* Another factor is whether the theory or technique has been subjected to peer review and publication. *Id.* Widespread acceptance or, conversely, minimal

support can be weighty factors in the determination of whether certain evidence is admissible under Evid. R. 702. Again, these factors, while useful do not comprise a specific test that must be satisfied to pass muster under Evid. R. 702(b).

In *Malinski v. State,* 794 N.E.2d 1071 (Ind.2003), a criminal case, our supreme court reviewed a challenge to expert testimony. The supreme court found that admission of the expert testimony was not error because the expert's opinion was not a matter of "scientific principles" under Evid. R. 702(b), but rather was expert testimony based upon "specialized knowledge." *Id.* at 1084.

Likewise, in a civil case, *PSI Energy, Inc. v. Home Insurance. Co.,* 801 N.E.2d 705 (Ind.Ct.App.2004), *trans. denied,* this court upheld the trial court's decision not to strike the testimony of an expert regarding his testimony about environmental contamination that had not been peer-reviewed or written down. We held that the expert's theory was based upon relatively simple concepts that were reliably based upon the expert's observations and application of his specialized knowledge to those observations. *Id.* at 741.

In *Lytle v. Ford Motor Co.,* 696 N.E.2d 465 (Ind.Ct.App.1998), *reh'g denied, trans. denied,* the court noted as follows:

Thus, where an expert's testimony is based upon the expert's skill or experience rather than on the application of scientific principles, the proponent of the testimony must only demonstrate that the subject matter is related to some field beyond the knowledge of lay persons and the witness possesses sufficient skill, knowledge, or experience in the field to assist the trier of fact to understand the evidence or to determine the fact in issue.

Furthermore, if one party succeeds at having expert testimony admitted, other remedies remain for the opposing party. We clarified in *Hottinger v. Trugreen Corp. et al.,* 665 N.E.2d 593, 598 (Ind.Ct.App.1996) (*overruled on other grounds by Dow Chemical Co. v. Ebling ex rel. Ebling,* 753 N.E.2d 633 (Ind.2001)) that:

To the extent that Hottinger's evidence on the causation of her injuries is shaky, the conventional devices available to Trugreen, including vigorous cross-examination, the presentation of contrary evidence and careful instruction on the burden of proof, are the appropriate safeguards to be employed here, as [the expert's] opinion satisfies Evid. Rule 702.

 Here, the trial court was faced with O'Donnell's affidavit with attached curriculum vitae and his deposition testimony. His curriculum reflects that O'Donnell has practiced pharmacy for over thirty-five years. In this lengthy career, he, among others, developed a pharmacy in a pediatric hospital and, as its director, supervised the pharmacy for four years and was responsible for safe medication use. He worked two years in a second hospital, creating a pediatric pharmacy where he assessed and developed a medication system for administration of medicine to patients in all age groups. At the same time, he developed a drug dispensing system with its primary feature the measurement of medications. As a Professor of Pharmacy, O'Donnell has taught pharmacy students, medical students, physicians, pharmacists, nurses, and nursing students about the safe methods of administering particular medications to particular types of patients, as well as the safety of a particular device to administer different types of medication.

He has been employed by hospitals and others to evaluate the causes of medication errors and how to prevent them. O'Don-

nell has consulted with various pharmacies, pharmaceutical companies, medical device companies, and health care institutions relating to the appropriateness of devices used to administer medication to patients.

In his affidavit and deposition testimony, O'Donnell examined a graduated measuring cup, identical to the one used to administer the Capital of Codeine to Matthew. Based upon his examination, education, and experience, he stated that children are generally more sensitive to an overdose of medication than adults and thus, especially when administering opiate medications, require precise medicinal doses. Describing the characteristics of the Cup, he opined that "[t]he Cup is a device that is fit to be used to determine the volume of medications that do not require [p]recision [m]easurements." (Appellants' App p. 288). He concluded that "[t]he Cup is defective and unreasonably dangerous as a volume measuring device to determine [p]recision [m]easurements" and that a cause of the overdose was:

(i) The Cup's characteristics;

(ii) The graduated measurement markings of the Cup not creating a clear contrast that could be easily read against the color of the Cup; and

(iii) The Cup's graduated measurements are not sufficiently visible to act as a reminder or checklist for the user when measuring the volume of medications to be administered.

(Appellants' App. pp. 289–90). Additionally, he opined that a cause of Matthew's overdose and subsequent death was the lack of fitness and defective condition of the Cup.

The Cup Defendants now challenge O'Donnell's opinions as lacking any scientific foundation,[2] unreliable, and irrelevant. In essence, they request this court to completely ignore O'Donnell's affidavit and deposition because they claim his opinions are entirely speculative. While it is true that no scientific principles underlie O'Donnell's opinion, his opinion is still admissible as it is proper expert testimony based upon specialized knowledge, pursuant to Evid. R. 702. *See Lytle,* 814 N.E.2d at 309; *Malinski,* 794 N.E.2d at 1085. O'Donnell is a registered pharmacist and university professor who examined a medical device for dispensing medications to children and offered his professional opinion about what his examination disclosed. His opinions are reliably based upon his own observations and application of his specialized pharmaceutical knowledge to those observations. *See PSI Energy, Inc.,* 801 N.E.2d at 741. As such, we find them to be reliable and relevant to the issues at hand. Any challenge to O'Donnell's opinions and perceived gaps in his examination could be exploited at trial through vigorous cross-examination. Mindful of our standard of review, we cannot conclude that the trial court abused its discretion by admitting O'Donnell's testimony.

## II. *Appeal*

On appeal, the Kovachs contend that the trial court erred in entering summary

---

2. Although the Cup Defendants on cross appeal do not expressly contest O'Donnell's opinion as lacking a scientific foundation, they do allude to the fact that O'Donnell's opinions were not subjected to peer review, do not include a known rate of error, and are not supported by literature. Additionally, their argument is replete with references to the *Daubert* criteria. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Shafer & Freeman Lakes Envtl. Conservation Corp. v. Stichnoth,* 877 N.E.2d 475, 484 (Ind.Ct.App. 2007), *trans. denied* (enumerating the five *Daubert* factors to test the scientific reliability of expert testimony pursuant to Ind. Evid. R. 702(b)). We find that those claims, taken together, properly refer to the alleged scientific basis of O'Donnell's opinions.

judgment in favor of the Cup Defendants. In sum, they present us with two claims each under the Uniform Commercial Code and under the Product Liability Act, maintaining that a genuine issue of material fact exist on each assertion. Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). In reviewing a trial court's ruling on summary judgment, this court stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment. *Hendrick Cty. Bd. of Comm'rs v. Rieth–Riley Const. Co., Inc.*, 868 N.E.2d 844, 848–49 (Ind.Ct. App.2007). Thus, on appeal, we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law. *Id.* at 849. In doing so, we consider all of the designated evidence in the light most favorable to the non-moving party. *Id.* The party appealing the grant of summary judgment has the burden of persuading this court that the trial court's ruling was improper. *Id.* When the defendant is the moving party, the defendant must show that the undisputed facts negate at least one element of the plaintiff's cause of action or that the defendant has a factually unchallenged affirmative defense that bars the plaintiff's claim. *Indiana Michigan Power Co. v. Runge*, 717 N.E.2d 216, 226 (Ind. Ct.App.1999), *reh'g denied.* Accordingly, the grant of summary judgment must be reversed if the record discloses an incorrect application of the law to the facts. *Rieth–Riley Const. Co., Inc.*, 868 N.E.2d at 849.

We observe that in the present case, the trial court summarily granted the Cup Defendants' motions of summary judgment and did not enter findings of fact and conclusions of law in support of its judgment. While a trial court's entry of findings is not required in summary judgment proceedings, such findings nevertheless offer this court valuable insight into the trial court's rationale for its judgment and facilitate appellate review. *See id.*

■ As our review of a trial court's ruling on summary judgment is limited to the evidence designated by the parties, it is incumbent upon the parties to present us with a complete appellate appendix. In this light we note that even though the chronological case history indicates that each of the Cup Defendants submitted a designation of evidence in support of its motion for summary judgment to the trial court, the appellant's appendix falls woefully short and merely includes the designated evidence of Medegen and the Kovachs. Even though the Cup Defendants filed their own Appendix, they omitted to rectify this oversight. We remind the parties that "[a]ny party's failure to include any item in an Appendix shall not waive any issue or argument." Ind. Appellate Rule 49(B). Thus, we will review the Kovachs' claims in light of the documents presented to us.

Additionally, we note that the Cup Defendants, in support of their arguments, extensively refer to O'Donnell's deposition testimony; nevertheless, this evidence was never designated to the trial court for its summary judgment proceedings. Therefore, we will not consider O'Donnell's deposition testimony when reviewing the Kovachs' assertions.

## A. Product Liability Act

Indiana's Product Liability Act governs all actions that are brought by a user or consumer against a manufacturer or seller for physical harm caused by a product regardless of the substantive legal theory or theories upon which the action is brought. Ind.Code § 34–20–1–1. Essentially, the Product Liability Act was a codi-

fication of the common law doctrine of strict liability, through which the Indiana legislature intended to preempt the field of strict liability in tort. *Koske v. Townsend Eng'g Co.*, 551 N.E.2d 437, 442 (Ind.1990). After amendments to the Act in 1995, it is now "clear the legislature intended that the [A]ct govern all product liability actions, whether the theory of liability is negligence or strict liability in tort." *Stegemoller v. ACandS, Inc.*, 767 N.E.2d 974, 975 (Ind.2002).

In this case, the Kovachs choose to proceed under both the theory of strict liability in tort and negligence.

### 1. *Strict Liability*

To bring a claim under the strict liability premises of the Product Liability Act, a plaintiff must establish that (1) the product is defective and unreasonably dangerous, (2) the defective condition existed at the time the product left the defendant's control, and (3) the defective condition is the proximate cause of the plaintiff's injuries. *Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind.2007). A product may be defective under the Act when the manufacturer fails in its duty to warn of a danger or instruct on the proper use of the product as to which the average consumer would not be aware. *Id.* This duty is two-fold: (1) to provide adequate instructions for safe use and (2) to provide a warning as to dangers inherent in improper use. *Id.* "[I]n an action based on . . . an alleged failure to provide adequate warnings or instructions regarding the use of the product, the party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in . . . providing the warnings or instructions." I.C. § 34-20-2-2. Although the adequacy of the warnings, which implicates a breach of duty, is generally a question of fact for the trier of fact to resolve, the nature of the duty to provide warnings is a question of law to be decided by the court. *Ford Motor Co.*, 868 N.E.2d at 810.

"Unreasonably dangerous," for purposes of the Act, refers to any situation in which the use of a product exposes the user or consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics common to the community of consumers. I.C. § 34-6-2-146. The requirement that the product be in a defective condition focuses on the product itself, while the requirement that the product be unreasonably dangerous focuses on the reasonable expectations of the consumer. *Cole v. Lantis Corp.*, 714 N.E.2d 194, 198 (Ind.Ct. App.1999).

The Kovachs now claim that the Cup was defective and unreasonably dangerous as it failed to include a warning of the dangers in the Cup's use. In support of their assertion, they designated O'Donnell's affidavit stating that as children are more sensitive to an overdose of medication than adults, they require precise measurement of their medicinal dosing, especially when dealing with opiates. Furthermore, the Kovachs focus on O'Donnell's description of the Cup as being translucent with the volume measurement graduation markers being of the same translucency as the Cup. These measurement markers are located on the interior surface of the Cup and have a similar translucency as the Cup. Additionally, the markers vary in the vertical distance between the ml markings.

In response, the Cup Defendants point to Nurse Robinette's experience in using similar cups throughout her nursing career without ever experiencing difficulty in distinguishing between the volume markings.

In fact, during her deposition, she stated that she could visualize the Cup half full.[3] Nevertheless, the Kovachs' designated Jim's deposition stating that he noticed the Cup being completely full when Nurse Robinette entered Matthew's hospital room.

Mindful of the Cup's purpose—dispensing medicine to young children—and its characteristics, we find that under the circumstances it would have been reasonable to include a warning with the Cup, stating that it should be used with caution when dispensing precise doses of medications. As such, we find that the Kovachs established that the Cup was defective in its design by failing to include a warning.

■ Furthermore, we note that the second element of a product liability claim sounding in strict liability, whether a product is unreasonably dangerous, is a question of fact that must be resolved by the jury. *Baker v. Heye–America,* 799 N.E.2d 1135, 1140 (Ind.Ct.App.2003), *trans. denied.*[4] We will analyze the causation element in section C. of this opinion.

### 2. Negligence

■ With respect to a claim of negligence under the Product Liability Act, a plaintiff is required to prove: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach. *Ford Motor Co.,*

868 N.E.2d at 810. As with the strict liability action, a product may be defective under the Act where the manufacturer fails in its duty to warn of a danger or instruct on the proper use of the product as to which the average consumer would not be aware. *Id.* Both parties designate the same evidence supporting their strict liability argument and negligence claim. For the same reasons we concluded that a genuine issue of fact existed to support the Kovach's strict liability action, we find that their negligence claim, at this time, survives the Cup Defendants motion for summary judgment. We will address the causation element below.

### B. *Uniform Commercial Code*

■ Actions brought under the Product Liability Act and the UCC "represent two different causes of action ... [t]he Product Liability Act governs product liability actions in which the theory of liability is negligence or strict liability in tort, while the UCC governs contract cases which are based on a breach of warranty." *Hitachi Const. Machinery Co., Ltd. v. AMAX Coal Co.,* 737 N.E.2d 460, 465 (Ind. Ct.App.2000), *reh'g denied, trans. denied* (quoting *B & B Paint Corp. v. Shrock Mfg., Inc.,* 568 N.E.2d 1017, 1020 (Ind.Ct. App.1991)). The UCC and the Product Liability Act provide alternative remedies. *Id.* Also, the adoption of the Product Lia-

---

3. Unlike the Cup Defendants, we do not believe that Nurse Robinette was the actual user of the Cup; in fact, Matthew was the last user as he drank the Codeine that Nurse Robinette had poured him in the Cup.

4. Additionally, the Cup Defendants, relying on *Bemis Co. v. Rubush,* 427 N.E.2d 1058 (Ind. 1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982), assert that "not only must the product be rendered unreasonably dangerous by the defect, the defect must be hidden and not normally observable, thereby constituting a *latent* danger in the use of the

product." (Appellees Br. p. 5). However, in *FMC Corp. v. Brown,* 551 N.E.2d 444, 446 (Ind.1990), our supreme court clarified that the "open and obvious danger rule asserted in [*Bemis Co.*] does not apply to strict liability claims under the Product Liability Act. It is now clear that evidence tending to prove an observable danger or defect of a product is simply that, evidence relevant and material to the issue of whether the product was defective and unreasonably dangerous and to the statutory affirmative defense of incurred risk."

bility Act did not vitiate the provisions of the UCC. *Id.*

 The UCC, codified in 1963 in part in I.C. § 26–1–2–101 through 26–1–2–725, constitutes a comprehensive system for determining rights and duties of buyers and sellers with respect to contracts for the sale of goods. Its general purpose is to: (1) simplify, clarify, and modernize the law governing commercial transactions; (2) permit the continued expansion of commercial practices through custom, usage, and agreement of the parties and (3) make uniform law among the various jurisdictions. *Wilson v. Royal Motor Sales, Inc.,* 812 N.E.2d 133, 135 (Ind.Ct. App.2004), *reh'g denied.* Besides express warranties, the UCC created several implied warranties, two of which are at issue here: the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. *See* I.C. §§ 26–1–2–314; 36–1–2–315. These implied warranties of merchantability and fitness for a particular purpose do not arise out of an agreement between the parties; they may even exist when no specific promise has been made by the seller to the buyer. *Woodruff v. Clark Co. Farm Bureau Co-op. Ass'n,* 153 Ind.App. 31, 286 N.E.2d 188, 194 (1972). Thus, they are imposed by operation of law for the protection of the buyer and they must be liberally construed in favor of the buyer. *Id.* at 195.

1. *Implied Warranty of Merchantability*

 Section 314 of the UCC specifies the implied warranty of merchantability as follows:

(1) Unless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must at least be such as:

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair, average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

I.C. § 26–1–2–314. The effect of the language is to create a broad warranty, covering the consumer's reasonable expectations that a good will be fit for its ordinary use. *Pizel v. Monaco Coach Corp.,* 364 F.Supp.2d 790, 793 (N.D.Ind.2005).

 It was the rule in Indiana that vertical privity of contract between buyer and seller must be shown before one could assert a claim for a breach of an implied warranty under the UCC. *See Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.,* 714 N.E.2d 1218, 1229 (Ind.Ct.App. 1999), *vacated in part on other grounds, Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.,* 746 N.E.2d 941 (Ind. 2001). However, on February 22, 2005, our supreme court issued its opinion in *Hyundai Motor America, Inc. v. Goodin,* 822 N.E.2d 947 (Ind.2005), which significantly changed Indiana law on privity with regard to implied warranties. Specifically, the *Goodin* court held that vertical privity was not required between a consumer and

a manufacturer as a condition to a claim by the consumer against the manufacturer for breach of the manufacturer's implied warranty of merchantability. *Id.* at 959.

Unlike the Kovachs, we believe that the *Goodin* holding is limited to the implied warranty of merchantability only and cannot be extended to the other implied warranties under the UCC. In reviewing the language of the warranties in combination with the *Goodin* holding, it is clear that the court intended to limit its holding to the implied warranty of merchantability. Specifically, our supreme court stated

> We think that ordinary consumers are entitled to, and do, expect that a consumer product sold under a warranty is merchantable, at least at the modest level of merchantability set by UCC section 2–314, where hazards common to the type of product do not render the product unfit for normal use.

*Id.* at 959. Thus, the court appears to abolish the privity requirement in the implied warranty of merchantability because this is the minimum warranty that an ordinary consumer would expect to have upon purchasing a good for normal use. In contrast, the *Goodin* court did not address the implied warranty of fitness for a particular purpose, which extends beyond a consumer's minimum expectation, because this warranty is only created when the seller has knowledge that a consumer intended to use the good for a particular use. *See* I.C. § 26–1–2–315; *Pizel*, 364 F.Supp.2d at 793. This type of knowledge is typically only acquired when parties negotiate a contract for sale, something which remote manufacturers rarely do. To hold a manufacturer liable for a breach of the implied warranty of fitness for a particular purpose when a manufacturer is not in the position to obtain the knowledge that a good is going to be used for a particular purpose runs contrary to the

UCC. *Pizel*, 364 F.Supp.2d at 793. Although *Goodin* abolishes the privity requirement in regards to the implied warranty of merchantability, there is nothing in our supreme court's *Goodin* opinion that suggests that the court was attempting to completely undermine the warranty requirements set forth in I.C. § 26–1–2–315.

■ Accordingly, in light of the abolishment of the privity requirement, the Kovachs only need to designate evidence establishing a genuine issue of material fact that the Cup was fit for its ordinary use. The Kovachs state that the Cup's ordinary use is "to make precision measurements of medications that require such measurements." (Appellants' Br. p. 23). When administering medication to children, precise measurements are imperative. Doubting its fitness, they point to O'Donnell's affidavit describing the Cup's graduation markings. These markings have the same translucent appearance as the Cup and vary in the vertical distance between the ml markings. As a result, the Cup does not provide a clear contrast that is easy to read.

In response, while responding to the Kovachs' product liability claim, the Cup Defendants nevertheless fail to develop a cogent argument under the UCC. Therefore, they have waived their argument for our review. *See* Appellate Rule 46(A)(8). Considering all of the designated evidence in the light most favorable to the Kovachs', we find that a genuine issue of material fact exist as to whether the Cup was fit for its ordinary use.

### 2. *Implied Warranty of Fitness For a Particular Purpose*

■ Next, the Kovachs assert that the Cup was unfit for its particular purpose. Indiana Code section 26–1–2–315 defines the UCC's implied warranty of fitness for a particular purpose as follows:

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified under I.C. [§ ] 26–1–2–316, an implied warranty that the goods shall be fit for such purpose.

Unlike the broad implied warranty of merchantability, the implied warranty of fitness for a particular purpose is more specific because it goes beyond a general common use warranty and attaches only when the seller, at the time of contracting, knew of a particular purpose for which the good would be used. *Pizel*, 364 F.Supp.2d at 793. In addition, this warranty requires that the consumer must have relied on the seller's knowledge in selecting the suitable good that would meet the particular purpose. *Id.* In support of their argument, the Kovachs designated the same evidence as for the implied warranty of merchantability. And again, the Cup Defendants failed to develop a cogent argument under the UCC. *See* Appellate Rule 46(A)(8).

■ However, bearing in mind our supreme court's *Goodin* holding, the buyer is required to establish vertical privity with the seller of the good prior to asserting an implied warranty of fitness for a particular purpose. Recognizing the potential problematic nature of this requirement, the Kovachs allege in their Complaint that Surgicare, the party administering the Codeine to Matthew, is their agent in acquiring and selecting the Cup used to dispense medicine to children. While we applaud this novel approach taken by the Kovachs, we are not convinced.

■ Generally, the question of whether an agency relationship exists is a question of fact. *Rheem Mfg. Co.*, 714 N.E.2d at 1230. To establish an agency relationship, three elements must be shown: (1) a manifestation of consent by the principal to the agent; (2) an acceptance of the authority by the agent; and (3) control exerted by the principal over the agent. *Id.* Here, the Kovachs did not designate evidence establishing any of the three elements of agency. Even if any evidence would have been designated, we still fail to understand how the Kovachs could have exerted control over Surgicare in the selection of the Cup. As the Kovachs have not persuaded this court that the trial court's ruling was improper, we affirm the trial court's grant of summary judgment with respect to the implied warranty of fitness for a particular purpose under the UCC.

## C. *Causation*

■ Besides the particular elements for each cause under the UCC and Product Liability Act, the Kovachs are required to prove causation between the Cup and Matthew's death. *See Ford Motor Co.*, 868 N.E.2d at 810 (holding that product liability actions for negligence and strict liability necessitate the plaintiff to prove proximate cause); *Frantz v. Cantrell*, 711 N.E.2d 856, 860 (Ind.Ct.App.1999) (holding that any action based on breach of warranty "requires evidence showing not only the existence of the warranty but that the warranty was broken and that the breach of warranty was the proximate cause of the loss sustained").

■ Proximate cause "requires, at a minimum, causation in fact-that is, that the harm would not have occurred 'but for' the defendants' conduct. The 'but for' analysis presupposes that, absent the tortious conduct, a plaintiff would have been spared suffering the claimed harm." *Daub v. Daub*, 629 N.E.2d 873, 877 (Ind. Ct.App.1994), *trans. denied.* The defendant's act need not be the sole proximate

cause; many causes may influence a result. *Ortho Pharm. Corp. v. Chapman,* 180 Ind.App. 33, 388 N.E.2d 541, 555 (1979). The question is whether "the original wrong was one of the proximate rather than remote causes." *Id.* Proximate cause is generally a question of fact; therefore, summary judgment is rarely appropriate. *Hellums v. Raber,* 853 N.E.2d 143, 146 (Ind.Ct.App.2006). However, the issue of proximate cause becomes a question of law where only a single conclusion can be drawn from the facts. *Florio v. Tilley,* 875 N.E.2d 253, 256 (Ind.Ct.App. 2007).

Here, the designated facts viewed in the light most favorably to the Kovachs establish that Matthew should have received 15ml of Codeine, which would have filled one-half of the Cup. Instead, Jim noted that Nurse Robinette had poured at least 30ml of Codeine, filling the Cup, and gave the medicine to Matthew, who drank it all. As a result of the overdose, Matthew died. The Kovachs argue that because a user of the Cup would read and heed an appropriate warning against the use of the Cup to dispense precise measurements of medications to children, the absence of such warning creates a presumption of causation.

In support of their argument, they direct us to several opinions by this court standing for the proposition that there is "a presumption that an adequate warning would be heeded. This operates to the benefit of a manufacturer where adequate warnings are in fact given. Where warnings are inadequate or missing, however, the presumption is in essence a presumption of causation." *Ortho,* 388 N.E.2d at 555; *see also Summit Bank v. Panos,* 570 N.E.2d 960, 968 (Ind.Ct.App.1991), *abrogated on other grounds by Vergara v. Doan,* 593 N.E.2d 185 (Ind.1992); *Jarrell v. Monsanto Co.,* 528 N.E.2d 1158, 1168

(Ind.Ct.App.1988), *reh'g denied, trans. denied.*

In *Ortho,* the plaintiff suffered from thrombophlebitis, a condition the defendant oral contraceptive manufacturer was found to have inadequately warned against. *Ortho,* 388 N.E.2d at 554. In *Summit Bank,* a patient died after combining a prescribed drug with alcohol. We found a question of fact as to whether the doctor was negligent for failing to warn that the drug he prescribed could cause death if mixed with alcohol. *Summit Bank,* 570 N.E.2d at 962–63. In *Jarrell,* the plaintiff was injured by an explosion of sulphur dust. We found that factual issues regarding the adequacy of the sulphur manufacturer's warnings about its products' flammability precluded summary judgment. *Jarrell,* 528 N.E.2d at 1160–61.

In all these cases, the absent or inadequate warning involved the very risk that caused injury to the plaintiff; likewise, here the absence of a warning not to use the Cup to dispense precise medicinal dosages to children, involved the very risk— the overdose of Capital of Codeine—that caused Matthew's death. As such, pursuant to this court's case law, we conclude that the missing warning is in essence a presumption of causation. *See Ortho,* 388 N.E.2d at 555.

Based on our analysis, we find that the Kovachs have established a genuine issue of fact with respect to both their claims under the Product Liability Act and the implied warranty of merchantability under the UCC. We reverse the trial court's grant of summary judgment in these respects but affirm the grant of summary judgment regarding the Kovachs' action of implied warranty of fitness for a particular purpose. We remand to the trial court for further proceedings.

## CONCLUSION

Based on the foregoing, we find that the trial court erred when granting summary judgment to the Cup Defendants with respect to the Kovachs' arguments under the Product Liability Act and the implied warranty of merchantability under the UCC. However, the trial court properly granted summary judgment with respect to the Kovachs action of implied warranty of fitness for a particular purpose under the UCC. Additionally, we find that the trial court did not abuse its discretion by admitting O'Donnell's testimony.

Affirmed in part, reversed in part, and remanded for further proceedings.

ROBB, J., concurs.

BAKER, C.J., dissents with separate opinion.

BAKER, Chief Judge, dissenting.

I respectfully dissent from the majority's conclusion regarding the proximate cause of Matthew's death. The facts as construed in the Kovachs' favor establish that Matthew should have received 15 ml of Codeine, which would have filled one-half of the Cup. Instead, Nurse Robinette poured at least 30 ml of Codeine, filling the Cup, and gave the medicine to Matthew, who drank it all. As a result of the overdose, Matthew died.

Assuming for argument's sake that the Cup should not be used for administering medication that requires precision measurement, I believe that the Kovachs have failed to establish that imprecise measuring caused Nurse Robinette to administer the overdose of Codeine to Matthew. The nurse administered at least double the recommended dosage of the drug to Matthew. No reasonable factfinder would conclude that her actions were the result of a *measuring* error. Although there are many other possible causes of the tragic error, I can only conclude, based on these facts, that it cannot be found to have resulted from imprecise measuring. Therefore, I believe that the designated evidence establishes that the Kovachs have failed to show that the alleged defect, failure to warn, and/or breach of duty on the part of the Cup Defendants was the proximate cause of Matthew's death.

The majority relies in part on cases standing for the following proposition: there is "a presumption that an adequate warning would be heeded. This operates to the benefit of a manufacturer where adequate warnings are in fact given. Where warnings are inadequate or missing, however, the presumption is in essence a presumption of causation." *Ortho Pharm. Corp. v. Chapman,* 180 Ind.App. 33, 388 N.E.2d 541, 555 (1979); *see also Summit Bank v. Panos,* 570 N.E.2d 960, 968 (Ind.Ct.App.1991), *abrogated on other grounds by Vergara v. Doan,* 593 N.E.2d 185 (Ind.1992); *Jarrell v. Monsanto Co.,* 528 N.E.2d 1158, 1168 (Ind.Ct.App.1988). As acknowledged by the majority, "[i]n all these cases, the absent or inadequate warning involved the very risk that caused injury to the plaintiff. . . ." Op. p. 71. Given those factual scenarios, it was logical to conclude therein that a causal link existed between the product missing an appropriate warning and the injuries caused by the risk that should have been warned against.

Here, in contrast, I do not believe that the risk that the Kovachs argue should have been warned against—imprecise measuring—is the risk that caused Matthew's death. Although the precise nature of Nurse Robinette's error is not discernible, I can only conclude that no reasonable factfinder could have determined that it was a measuring error. Under these circumstances, I simply do not believe that the presumption of causation applied by

the *Ortho* cases comes into play. As noted by the Cup Defendants, "it is illogical to conclude that *any* omitted or inadequate warning justifies a presumption of causation regardless of whether the risk of the warning at issue is the risk that actually caused the harm." Appellees' Br. p. 12 (emphasis in original). Thus, where, as here, an absent or inadequate warning did not involve the risk that caused injury to the plaintiff, I do not believe that there is a presumption of causation. Here, therefore, it was incumbent on the Kovachs to establish proximate causation—or, at the least, to raise a genuine issue of material fact regarding proximate causation. They have failed on both accounts. Consequently, I would affirm the entry of summary judgment in the Cup Defendants' favor.